**Karl IFERT and John Torrens, individually and as shareholders of Crane Builders, Inc.; Steven Schartel and Karl Ifert, as co-owners of account number 1501253 Berks County Bank; and Industrial Service Center, Inc.**

v.

**William H. MILLER and Richard H. Fritz, individually and t/a Devault Equipment Company, Inc., Devault Sales Co., Devault Equipment Co., and Deco; Summit White GMC Trucks, Inc.,; and Berks County Bank.**

No. CV 91–6569.

United States District Court, E.D. Pennsylvania.

Feb. 18, 1992.

As Modified April 27, 1992.

Kevin J. Sommar, Kelly, McLaughlin & Foster, Lansdale, Pa., for plaintiffs.

William C. Foster, Gerald F. Lipski, Kelly, McLaughlin & Foster, Philadelphia, Pa., James M. Lillis, Kozloff, Diener, Payne & Fegley, Wyomissing, Pa., for defendants.

OPINION

CAHN, District Judge.

## INTRODUCTION

Before the court is a multi-party dispute[1] involving multiple claims, counterclaims and cross-claims. Plaintiffs originally filed their complaint in the Bankruptcy Court for the Eastern District of Pennsylvania as related to a bankruptcy proceeding captioned "In Re: Crane Builders, Inc., Bankruptcy No. 89–2040ST". The bankrupt firm, Crane Builders, Inc., will hereinafter be referred to as "CBI". The defendant, identified as North Texas GMC Trucks[2], moved to withdraw the reference of this matter to the Bankruptcy Court. That Motion[3] was granted by opinion and order dated April 9, 1991, and the within case was placed on my docket as Civil Action No. 91–6569.

A jury was impaneled on January 21, 1992, and trial began on January 22, 1992. During the trial of the case, it became clear to me that there were no factual disputes which should be submitted to the jury. Those defendants who disagreed were permitted to make an identification of all factual issues which they thought should be submitted to the jury. All counsel were then given an opportunity to research and argue the complex issues involved in this matter. Thereafter I granted a directed verdict in favor of Karl Ifert and Steven Schartel, co-owners of account number 1501253 at the Berks County Bank, and against Summit in the amount of $131,-584.21.

## THE CLAIMS

The claims of Karl Ifert and John Torrens, individually and as shareholders of

1. During trial plaintiffs' counsel moved to join Steven Schartel as a plaintiff in his capacity as a co-owner of account number 1501253, Berks County Bank. I granted this Motion over the objection of defendants and have given plaintiffs leave to file an amended complaint. Hence, I entered an Order dated January 30, 1992 amending the caption.

2. The original caption referred to this defendant as North Texas GMC Trucks. It has been agreed by all counsel that the correct name of this defendant is Summit White GMC Trucks, Inc., and the Order of January 30, 1992, amends the caption to reflect this correction. Summit White GMC Trucks, Inc. will hereinafter be referred to as "Summit".

3. The Motion for Withdrawal was docketed by this court as Miscellaneous No. 90–0758.

CBI, against Berks County Bank have been withdrawn with prejudice by plaintiffs' counsel. All cross-claims by other defendants against Berks County Bank have also been withdrawn with prejudice. All claims of Karl Ifert and John Torrens, individually and as shareholders of CBI and Industrial Service Center, Inc., based upon the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, have been withdrawn without prejudice.[4] All claims of Karl Ifert and John Torrens, individually and as shareholders of CBI and Industrial Service Center, Inc., against William H. Miller and Richard H. Fritz, individually and trading as Devault Equipment Company, Inc., Devault Sales Company, Devault Equipment Co., and Deco, have been withdrawn from this proceeding without prejudice to raise those claims in the Bankruptcy Court or in subsequent proceedings.[5]

The claims remaining in this case are:

1. Ifert and Schartel, as co-owners of account number 1501253, against Summit based upon an alleged assignment. Summit has filed a crossclaim for indemnification against Miller and Devault Equipment Company, Inc.

2. Miller, Fritz, Devault Equipment Company, Inc., Devault Sales Co., Devault Equipment Co., and Deco against Ifert, Torrens and Industrial Services Center, Inc., based upon counterclaims alleging breach of contract, fraud, conversion and tortious interference with contract.

### THE PARTIES AND THE UNCONTESTED FACTS [6]

Karl Ifert and John Torrens are adult, competent individuals who are citizens of the Commonwealth of Pennsylvania. They each own twenty-five percent (25%) of the outstanding shares in CBI. They each own fifty percent (50%) of the outstanding shares in Industrial Services Center, Inc.

William H. Miller and Richard H. Fritz are adult, competent individuals who are citizens of the Commonwealth of Pennsylvania. Miller and/or Fritz are controlling shareholders and/or principals in Devault Equipment Company, Inc., Devault Sales Co., Devault Equipment Co., and Deco. Each owns 25% of the outstanding shares in CBI. Miller and Fritz have extensive experience in the crane business.

Summit had a prime contract with the City of Houston to supply the city with two trucks with a small crane attached to each truck. Summit subcontracted (by means of a purchase order) the fabrication of the cranes and their installation on the trucks to Devault Equipment Company, Inc.

Another truck dealer in Texas also had a prime contract with Houston to supply two trucks with a large crane attached to each truck. Devault Equipment Company, Inc. received a subcontract from this dealer for the same type of work it had agreed to do for Summit.

Miller and Fritz met with Ifert and Torrens in early 1988 to discuss the possibility that Ifert and Torrens would finance and participate in the fabrication and installation of the cranes. Initially, it was the intention of the four individuals to organize CBI to do this work. Then, Ifert, Torrens, Miller and Fritz decided that the fabrication would be done by a firm known as Cedarville Manufacturing, Inc., with Industrial Service Center, Inc. being used to paint the cranes and install hydraulic con-

---

**4.** The withdrawal with prejudice of all claims and crossclaims against the Berks County Bank and the withdrawal without prejudice of all of plaintiffs' claims under RICO were confirmed in an order dated January 28, 1992.

**5.** Plaintiffs' counsel has agreed to withdraw these claims without prejudice. The order accompanying this opinion will confirm his agreement.

**6.** The uncontested facts are derived principally from Exhibit 245 which was submitted by Summit. The parties have used a consecutive numbering system to identify each exhibit without reference to whether the exhibit was introduced by a particular party. In other respects, the uncontested facts are either agreed to by the parties or derived from documentary evidence which is unambiguous.

trols. When Cedarville Manufacturing, Inc. declined to proceed with the fabrication, Ifert, Torrens, Miller, and Fritz decided to proceed with the organization of CBI with the intention that CBI would perform the fabrication work while Industrial Services Center, Inc. would do the painting and install the hydraulic controls. In the meantime, the parties had been consulting Berks County Bank in regard to obtaining financing to pay for the work involved.

A chronology of the significant events follows.

1. In December of 1987, Summit issued a purchase order to Devault Equipment Company, Inc. for the fabrication and installation of two cranes on the back of two trucks. When the fabrication and installation process was completed, these trucks were to be delivered to the City of Houston.

2. In December of 1987, White GMC of Houston (a truck dealer unrelated to Summit) issued a purchase order to Devault Equipment Company, Inc. for the fabrication of two larger cranes to be placed on the back of two trucks supplied by White GMC of Houston.

3. Between January and April of 1988, Miller and Ifert discussed creating CBI.

4. On April 25, 1988, Devault Equipment Company, Inc. issued CBI a purchase order relating to the four cranes.

5. In April of 1988, a subsidiary of Industrial Service Center, Inc., known as Hi Lift, obtained a line of credit in connection with the fabrication of the cranes in question.

6. On June 7, 1988, an arrangement was initiated whereby Cedarville Manufacturing, Inc. would perform the fabrication with money advanced to it under the Hi Lift line of credit.

7. On June 14, 1988, Miller, as President of Devault Equipment Company, Inc., assigned all proceeds from the contract with Summit to "account number 1501253 at the Berks County Bank". A copy of this assignment, known as Exhibit 7, is attached to this Opinion as Appendix "A".

8. On June 28, 1988, Larry Davis, as sales manager for Summit, acknowledged Exhibit 7.

9. On June 28, 1988, Cedarville Manufacturing, Inc. declined to proceed with the fabrication of the cranes.

10. On July 5, 1988, CBI was formally incorporated and began to fabricate the cranes.

11. During the summer and fall of 1988, the two cranes to be placed on the back of trucks pursuant to the purchase order issued by Summit were fabricated by CBI. The work was completed, the cranes were delivered to Summit, and Summit delivered them to the City of Houston.

12. On October 21, 1988, Miller was elected president of CBI. A line of credit to CBI was established at the Berks County Bank with documentation that contemplated an assignment by Devault Equipment Company, Inc. of the proceeds from the White GMC Trucks of Houston purchase order (relating to the two larger cranes) to Berks County Bank.

13. On November 9, 1988, Devault Equipment Company, Inc. mailed an invoice to Summit for one of the cranes.

14. On November 10, 1988, CBI shipped the first crane to Summit.

15. On November 15, 1988, Devault Equipment Company, Inc. mailed an invoice to Summit for the second crane and CBI shipped the second crane.[7]

16. On November 15, 1988, Berks County Bank closed the CBI checking account.

17. On November 18, 1988, Steven Schartel, acting as production manager for CBI, closed the doors of CBI and laid off all employees.

18. Thereafter, Miller, on behalf of Devault Equipment Company, Inc., canceled

7. There was some suggestion at trial that the November 9 and November 15 invoices constituted a waiver of the alleged assignment of June 14. The invoices did not contain any language of waiver; they are no more than statements as to how much Summit owed on the contract. These invoices did not refer to, nor did they modify, any other contract, such as the alleged assignment of June 14.

the remaining purchase order to CBI for the two large cranes.

19. On February 3, 1989, Summit was instructed by Miller to send payment for the completed cranes to a Maryland bank for deposit in an account controlled by Miller and/or Devault Equipment Company, Inc.

20. On February 14, 1989, Summit paid the Devault invoices by mailing a check in the amount of $131,584.21 to Miller. Miller did not remit this sum to either the assignees or CBI.

21. In March of 1989, Torrens and Ifert filed an application with the Bankruptcy Court to place CBI into involuntary bankruptcy.

## EXHIBIT 7 AND ITS EFFECT

The key document in this controversy is Exhibit 7. It must be kept in mind that, although it is a letter to Mr. Davis at North Texas GMC Trucks, the correct name of Mr. Davis's firm is Summit.

■ Summit's initial thrust is that Exhibit 7 is not an assignment but is merely a notice of an assignment.[8] Summit contends that, because there is no underlying separate document of assignment, the notice of assignment by itself has no legal significance and therefore Summit could pay Devault Equipment Company, Inc. directly without incurring liability to the assignee mentioned in Exhibit 7.[9] This issue is resolved by reference to *Corbin on Contracts* which states:

> There is no required form in which an assignment for value must be made; all that is necessary is for the assignor so to express himself as to indicate an intention then and there to transfer his right to the assignee.

8. Defendant's Memorandum in Support of It's Motion For Summary Judgment argues at some length that Pennsylvania law should apply in this case: The reason this argument is advanced, it appears, is to exploit favorable Pennsylvania law with regard to the formation and interpretation of a contract to assign. This court can find no point in Pennsylvania's law of assignments at variance with Texas' on a dispositive issue in this case. Notwithstanding the irrelevance of the choice of law question, I feel that I must comment on the choice of law question. As Summit correctly notes, in the absence of a choice of law provision in a disputed contract, the court is to follow the flexible principles set out in *Restatement (Second) of Conflict of Laws* § 188. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) (federal court must apply the choice of law rules of the state in which they sit); *Griffith v. United Airlines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964) (applying principles in *Restatement (Second) of Conflict of Laws* to Pennsylvania). Of the principles set out, two seem especially important in this case: "(c) the place of performance ... [and] (d) the location of the subject matter of the contract...." *Restatement (Second) of Conflict of Laws* § 188. The assignment contract between Devault and Ifert and Schartel stated that it was expected that Summit was to send the amount of money specified in the assignment from its offices in Texas to the assignee in Pennsylvania. The subject matter of the contract to assign was the proceeds of a contract which ultimately was to be completed in Texas. Thus, judging only from the facts alleged, it appears that Texas had the most significant contacts and greatest interest in this contract to assign.

If the question before me is which states' law of assignment to apply in order to determine the assignment contract's validity, then *Restatement (Second) of Conflict of Laws* § 209 suggests that Texas law should apply ("[the right should be determined] by the local law of the state which, with respect to the particular issue, has the most significant relationship to the assignment and the parties"). Thus, if I were to apply Pennsylvania's conflict of law principles, Texas law would still apply, since Pennsylvania has adopted § 209. *See DeAngelis v. Scott*, 337 F.Supp. 1021 (W.D.Pa.1972) (assignment negotiated and signed in Pennsylvania subject to Massachusetts law of assignments since Massachusetts has most significant relationship).

9. To further its argument that Exhibit 7 is not an assignment, Summit directs the Court's attention to the following peculiarity in its language: Beneath the word "ACKNOWLEDGEMENT" is a statement of receipt that distinguishes between the "notice" of the assignment and the "copy of the above-mentioned instrument of assignment" (Davis received only the notice). Two things must be noted. First, if Davis did not receive a copy of the instrument of assignment, what did he intend to convey when he signed and returned a statement that acknowledged its receipt? Second, a writing that states the terms of assignment and also refers to another "separate writing" of assignment is itself an act of assignment. *See Ertel v. McCloskey*, 167 Pa.Super. 120, 74 A.2d 652, 653–54 (1950) (by signing the first writing, the defendant "did not, as the court held, agree to assign; it actually assigned on that date").

Arthur Corbin, 4 *Corbin on Contracts* § 879 (1951) (hereinafter *"Corbin"*). Furthermore,

> The owner of a right can make an effective assignment of it by delivering to the assignee *or* to the obligor a written order that the latter shall pay the assignee....

*Corbin* § 880 (emphasis added). No particular language is necessary and, as *Corbin* observes, the notice to the obligor is itself effective as an assignment.[10]

■ It is also undisputed that Devault Equipment Company, Inc. delivered a copy of Exhibit 7 to Schartel and that Schartel pressed Summit to execute the acknowledgement and fax a copy to him. On June 28, 1988, Davis of Summit faxed an executed copy of Exhibit 7 to Schartel. It is clear from a reading of Exhibit 7 that Devault Equipment Company, Inc. intended to assign the proceeds of the purchase order. Exhibit 7 states: "that monies due or to become due under this purchase order described above have been assigned to Account Number 15015253 at the Berks County Bank." Therefore, Exhibit 7 is an effective assignment. It certainly is not just an "authority" instructing an agent to pay a third party, as was the case in *Edmund Wright Ginsberg Corp. v. C.D. Kepner Leath. Co.*, 317 Mass. 581, 59 N.E.2d 253, 258 (1945). Nor is Exhibit 7 merely a promise by Devault Equipment Company, Inc., to do something in the future. Exhibit 7 is a written confirmation of a present intention on the part of Devault Equipment Company, Inc. to assign the proceeds. Exhibit 7, especially after notice to and acceptance by Summit, places in the assignee the sole right to receive the proceeds from Summit.[11]

■ Summit next contends that the assignment is ineffective because it is to an account number rather than to named assignees or to a particular bank. It is clear that the owners of account number 1501253 are Schartel and Ifert. I have permitted plaintiffs to add Schartel as a named plaintiff by amending the complaint. Although it might have been better practice to use the name of the assignees rather than an account number, no case has been called to my attention holding that an assignment to an account number is ineffective. What is clear beyond per adventure is that Summit knew that the proceeds from its purchase order had been assigned and Summit acknowledged notice of the assignment and forwarded a copy of the document by fax to Schartel.

Summit's third line of defense is that the June 14 assignment is "invalid" because of "fraud, or breach of the underlying condition precedent." *See* Defendant's Memorandum of Law at 5 (hereinafter "Memorandum"). Summit lists a succession of acts performed by Ifert and Schartel, the assignees, against Devault, the assignor. Obviously, harms done by an assignee against an assignor are not normally the obligor's concern, and normally would be handled by a separate cause of action by the assignor against the assignee. If Ifert defrauded Devault, or in some other way harmed Devault in the formation or execution of the contract to convey this assignment, Devault would still have its legal remedies. Summit's interest in Ifert and Schartel's conduct towards Devault matters only if, as a result of the assignees' conduct, there was no contract to convey the assignment at all: If no assignment was conveyed, then Summit's duty would be to Devault, and not Ifert and Schartel.

Thus, Summit's only available argument with regard to the assignment contract between Devault and Ifert and Schartel is that the assignment was void. *See* 6A C.J.S. § 58 ("An assignment should be a

---

**10.** *See also* Samuel Williston, *A Treatise on the Law of Contracts* § 424 (3d ed. 1960) (hereinafter *"Williston"*) ("No words of art are required to constitute an assignment ..."); *Restatement (Second) of Contracts* § 324 (1981) (notice need only be the communication of "an intention to transfer the right," and the communication may be oral or in writing); n. 9 *supra* and the discussion of *Ertel* therein.

**11.** Although unnecessary in this case, since the language is so clear, I must note that according to *Williston* § 431, "[i]n case of doubt, an assignment is interpreted most strictly against the assignor ...," which, in this case, would support the assignee's claim against the obligor.

voluntary act on the part of the assignor, and if it is not, as where it is not given with full knowledge of its contents, it may be void"); *see also Glass v. Carpenter,* 330 S.W.2d 530, 537 (Tex.Civ.App.1959); *In re Holden,* 271 N.Y. 212, 2 N.E.2d 631, 633 (1936). As in other areas of contract law, an assignment contract is not the result of a voluntary action if it was "made under duress or coercion, or if it is not given with full knowledge of its contents." *Glazer v. Department of Hospitals of City of N.Y.,* 2 Misc.2d 207, 155 N.Y.S.2d 414, 417 (N.Y.Sup.Ct.1956). Since Summit has not argued that Devault entered into the assignment contract with Ifert and Schartel involuntarily, there is no basis upon which the assignment could be declared void.

 However, Summit has argued that since the assignment contract may be voidable (as opposed to void) because of fraud or another similar act, a factfinder should hear the evidence that supports the contention that Ifert and Schartel fraudulently induced Devault to enter into the assignment contract.[12] If a factfinder should hear such claims, it cannot be on the motion of Summit. It must be on the motion of Devault, for Summit cannot raise a challenge to a contract in which it was not a party and out of which it retained no rights, even if the challenge is based on a right that a party to the contract *could* raise.[13]

 Therefore, while the law permits the obligor to raise as a defense against the assignee the fact that the assignment

contract between the assignor and the assignee was void, it does not permit the obligor to raise, as a defense, the claim that the assignment contract between the assignor and the assignee is voidable: Voidability (based on fraud, for example) can be raised only "at the option of the injured party." 6A C.J.S. § 58; *see also Williston* § 432 ("If, however, the objection to the validity of an assignment is not that it is void but voidable only at the option of the assignor ... the debtor has no legal defense whether or not action is brought in the assignee's name, for it cannot be assumed that the assignor is desirous of avoiding the assignment"). Thus, the Texas courts, following this rule, have stated that "[a] debtor cannot interpose defects or objections which merely render the assignment voidable at the election of the assignor...." *Glass,* 330 S.W.2d at 537; *see also Tri–Cities Const., Inc. v. American Nat. Ins. Co.,* 523 S.W.2d 426 (Tex.Civ.App.1975). The New York courts agree: "The fact that the assignors might have a valid cause of action against the assignee because of fraud practiced upon them did not affect the legal title of the assignee, and could not be proved by a defendant in an action on the assignments." *Holden,* 2 N.E.2d at 633. Summit cannot raise Ifert and Schartel's alleged acts of fraud (or any other acts that would render the assignment contract voidable) as a defense.

 Of course, Summit could have raised, as a defense to payment, the argu-

---

**12.** As noted above, Summit equates voidability because of fraud with voidability because of breach of a condition precedent. *See* Memorandum at 5. The case it cites, *Badgett Mine Stripping Company v. Pennsylvania Turnpike Commission,* 173 F.Supp. 425 (M.D.Pa.1959) does not stand for that proposition. My review of the treatment of the term "voidability" in *Corbin, Williston,* and C.J.S. yields the following shared definition: a transaction is voidable in "cases of fraud, duress, mistake, lack of capacity, and some forms of illegality." *Corbin,* § 893. Although the disposition of no issue in this case relies on this clarification, I must suggest that I cannot agree with Summit that breach of a condition precedent would necessarily render an assignment contract voidable.

**13.** Summit's contract for the cranes is between Summit and Devault. Devault's assignment

contract is between Devault and Ifert and Schartel. The two contracts are completely separate from one another. As a result of the assignment contract, Summit's rights and duties under the crane contract remain the same: The only change is *to whom* those duties are owed (Ifert and Schartel step into Devault's shoes, and Summit's expectations are in no way disturbed). The assignment contract, however, is only between Devault and Ifert and Schartel: Summit was not a party to it, nor has any cognizable interest in it. Therefore, Summit has no right to step into Devault's shoes to raise Devault's contract rights against Ifert and Schartel. Summit has no more right than a complete stranger to raise Devault's rights under the assignment contract.

ment that the original contract upon which the assignment contract was based was not satisfied. As *Corbin* § 895 states:

> If the assigned claim arose out of a contract the terms of which are such as to make the claim either expressly, impliedly, or constructively conditional upon some performance by the assignor or upon any other fact or event, the nonoccurrence of the condition is a good defense against the assignor and also against the assignee.[14]

Summit cannot raise this argument now because it clearly was satisfied with the performance of the underlying contract for the cranes: The fact that it paid, in full, to Miller, suggests that it considers the contract to have been performed satisfactorily.

 The next line of defense by Summit is that the arrangement to fabricate and install the cranes was changed rendering the assignment invalid (or at least ineffective). Summit's argument is as follows. When the assignment in Exhibit 7 was prepared, it was with the understanding that Cedarville Manufacturing, Inc. would fabricate the cranes and that Industrial Service Center, Inc. would perform the painting and provide the hydraulic systems. It is clear that Cedarville Manufacturing, Inc. declined to proceed on or about June 28, 1988, which was the date Summit acknowledged the assignment. Since the underlying transaction was changed at that time, Summit urges that it can pay Devault Equipment Company, Inc. without regard to Exhibit 7.

There are several problems with this argument. It is true that the parties decided to use CBI to fabricate all four cranes. In addition, it is true that this decision was made in late June of 1988. Those facts, however, provide no aid to Summit who, as the obligor, is bound to honor the assignment at its peril.[15] The fact that Miller, Fritz, Ifert, and Torrens had not finalized the exact manner in which they would proceed is no reason to derogate the assignment. This is the type of defense that at the most would render the assignment voidable and cannot be raised by the obligor under the authorities referenced above. Nor is the fact that account number 1501253 may have been inactive at the time Summit paid Miller helpful to Summit's position. The fact that Summit may have been legitimately confused as to where it was to send the money assigned by Devault does not justify its decision to send that money to Miller. Summit was on notice and paid at its peril if it made payment other than to the assignee in Exhibit 7.

 Summit claims that the line of credit for which the assignment stood as collateral was subsequently satisfied when CBI substituted a direct line of credit from Berks County Bank for the Hi–Lift line of credit. This contention does not render the assignment void and cannot be raised by Summit.

 In any event, there are no factual issues in regard to the assignment which need to be submitted to a jury. Summit simply cannot ignore the assignment at the direction of Miller acting for the assignor.

 Summit also urges that Miller, as president of CBI, had authority to negate the assignment and order payment to the assignor.[16] First of all, CBI is not the assignee. The assignees are two individu-

---

**14.** *See also Restatement (Second) of Contracts* § 336(1) (1981) ("if the right of the assignor would be voidable by the obligor ... the right of the assignee is subject to the same infirmity").

**15.** An assignor, for example, cannot relieve an obligor of her duties by accepting payment notwithstanding the contract of assignment between the assignor and assignee. "Pay at one's peril" is a basic principle of the law of assignments. *See, e.g., Corbin* § 890:

> After notice of the assignment has been given to the obligor, or knowledge thereof received by him in any manner, the assignor has no remaining power of release. The obligor must pay the assignee.

*See also* Ronald Anderson, 9 *Anderson on the Uniform Commercial Code* § 318:22 (3d ed. 1985) ("After an assignment has been made, the assignor can not settle the claim against the obligor without the consent of the assignee").

**16.** Summit's attorney has protected the record by making an offer of proof that Miller and Davis (Summit's sales manager) would both testify that Miller told Davis he had authority from CBI as its president to make the assignment.

als because the business entity under which Miller, Fritz, Ifert, and Torrens were to fabricate the cranes had not been finalized. Second, even if this argument is viable, it would have to be made in the Bankruptcy Court because of the intervening bankruptcy of CBI.

■ Nor is Exhibit 244, a fax sent by Ifert to Miller on November 10, 1988, asking Miller to "Stay in touch and send checks which are related to the City of Houston job" a waiver by Ifert and Schartel of their rights under the assignment which may be raised by Summit.

The parties have stipulated that Summit paid $131,584.21 to Miller and/or Devault Equipment Company, Inc. Consequently, the owners of account number 15015253 at the Berks County Bank, namely Ifert and Schartel, are entitled to judgment against Summit in that amount. Ifert and Schartel will be directed to hold any funds recovered in this proceeding in trust to enable the Bankruptcy Court to adjudicate any claim that CBI may have against the fund.

Summit, of course, is entitled to judgment against Miller and Devault Equipment Company, Inc. on its crossclaim in the same amount.

## THE REMAND TO THE BANKRUPTCY COURT

■ It must be kept in mind that CBI is not a party to these proceedings and that the Trustee in Bankruptcy for that firm has not sought to intervene even though his counsel attended portions of the trial. It is arguable that the proceeds assigned by Exhibit 7 should be turned over by the assignees to the Trustee in Bankruptcy for administration. Whether or not counsel for the plaintiffs in the within case is entitled to a charging order against those funds is a matter to be determined, in the first instance, by the Bankruptcy Court. To the extent that any funds Summit pays

in this matter are returned to Miller or Devault Equipment Company, Inc. in the Bankruptcy Court or in any other subsequent proceedings, Summit shall have a first claim against any such funds.

Counsel for Miller and Devault Equipment Company, Inc. have urged the court not to grant a directed verdict against Summit. He argues that it would have been better practice to try all of his client's counterclaims against Ifert, Torrens and Industrial Service Center, Inc. before the jury impaneled in this case However, it must be remembered that CBI is not a party to these proceedings. Although the four individuals did have some type of pre-incorporation agreement for a joint venture; and, therefore, it is arguable that the counterclaims run against Ifert and Torrens individually; it is also arguable, with at least as much confidence, that the counterclaims are directed against CBI.[17] Finally, CBI itself may have claims against Miller, Fritz, Ifert and Torrens for breach of the fiduciary duties an officer and director owe to his corporation.

■ In the Memorandum and Order dated April 9, 1991, at Miscellaneous No. 90–0758, I withdrew the reference to the Bankruptcy Court. My primary reason for so doing was that the RICO claims required "mandatory withdrawal". In the present posture of this case, however, the non-core claims have been either adjudicated (the assignment issue) or withdrawn (plaintiffs' RICO claims, all claims and crossclaims against Berks County Bank, and plaintiffs' claims against the remaining defendants). All that remains are the counterclaims of Miller, Fritz and their companies. These counterclaims are inextricably intertwined with CBI's potential liabilities and potential recoveries. Consequently, these claims will be remanded to the Bankruptcy Court for resolution.[18]

An appropriate order follows.

---

17. The counterclaims include issues involving alleged delay in performance and failure to perform on the part of CBI.

18. It is also noted that, except for the RICO claims and the claims involving Summit, there is no independent basis for federal subject matter jurisdiction. The four individuals are all citizens of Pennsylvania. If their individual claims are not within the subject matter jurisdiction of the Bankruptcy Court as core proceedings, then they are not within the subject matter jurisdiction of this court. I retained

## ORDER

AND NOW, this 18 day of February, 1992, for the reasons set forth in the foregoing Opinion, IT IS ORDERED as follows:

1. A directed verdict in the amount of $131,584.21 is ENTERED in favor of Karl Ifert and Steven Schartel and against Summit White GMC Trucks, Inc. Judgment is hereby ENTERED in favor of Karl Ifert and Steven Schartel in the amount of $131,-584.21 against Summit White GMC Trucks, Inc.

2. A directed verdict in the amount of $131,584.21 is ENTERED in favor of Summit White GMC Trucks, Inc., and against William H. Miller and Devault Equipment Company, Inc. Judgment is ENTERED in favor of Summit White GMC Trucks, Inc., in the amount of $131,584.21 and against William H. Miller and Devault Equipment Company, Inc.

3. All of the remaining counterclaims in this proceeding on behalf of William H. Miller, Richard H. Fritz, Devault Equipment Company, Inc., Devault Sales Co., Devault Equipment Co., and DECO, are REMANDED and referenced to the Bankruptcy Court of the Eastern District of Pennsylvania for further adjudication in the matter of Crane Builders, Inc. No. 89-2040ST.

3. All of the claims of Karl Ifert, John Torrens and Industrial Service Center, Inc., against William H. Miller, Richard H. Fritz, individually and trading as Devault Equipment Company, Inc., Devault Sales Co., Devault Equipment Co., and Deco are withdrawn without prejudice.

---

these state court claims under concepts of supplemental jurisdiction. *See* 28 U.S.C. § 1367. Now that RICO is no longer the linchpin of jurisdiction, these issues would normally become triable solely in state court (where an action has already been filed). Thus, under subparts (2), (3) and (4) of 28 U.S.C. § 1367(c), I decline supplementary jurisdiction over the counterclaims brought by Miller, Fritz and their companies.

Let me emphasize, however, that I decline to reach the issue of whether the claims remaining in this litigation are in fact core proceedings as defined in 28 U.S.C. § 157, as opposed to non-core, non-federal issues. That is for the Bankruptcy Court to determine; if it determines that these claims are not core proceedings, then it has the power to remand them to state court. *See In re Mill–Craft Building Systems, Inc.,* 57 B.R. 531, 533 (Bankr.E.D.Wis.1986); *In re Baren,* 47 B.R. 39, 43 (Bankr.N.D.Ill.1984); *but see In re Chapman,* 132 B.R. 153, 160–61 (Bankr. N.D.Ill.1991) (describing conflict among districts over whether Bankruptcy Courts can enter an order of remand).

170

## APPENDIX A

# EQUIPMENT CO.

June 14, 1988

Exhibit-7
KAß
10-15-91

Mr. Larry C. Davis
North Texas GMC Trucks
2959 Irving Blvd.
Dallas, Texas 75247

Dear Mr. Davis:

This has reference to your PO #101903 dated December 29, 1987, entered into between Devault Equipment Company, Inc., P.O. Box 476, Pottstown, PA 19464, and North Texas GMC Trucks for purchase and installation of two (2) Devault Model TKC15-10 hydraulic cranes.

PLEASE TAKE NOTICE that monies due or to become due under this purchase order described above have been assigned to Account Number 1501253 at the Berks County Bank.

Payments due or to become due under such contract should be made to Account Number 1501253 at the Berks County Bank. P.O. Box 1097, Reading, PA 19603-9924.

Please, return to W. H. Miller one (1) copy of this notice, duly signed, and two (2) copies to Mr. Richard Gromis at the Berks County Bank.

Very truly yours,

W. H. Miller
President
DEVAULT EQUIPMENT COMPANY, INC.

### ACKNOWLEDGEMENT

Receipt is hereby acknowledged of the above notice and a copy of the above-mentioned instrument of assignment.

_____
(Signature)

_____
(Title) (Date)
6-28-88

P.O. BOX 260, DEVAULT, PA 19432
P.O. BOX 476, POTTSTOWN, PA 19464
215/323-1800

EXHIBIT M