**LIVONIA PROPERTY HOLDINGS, L.L.C., Plaintiff,**

v.

**12840–12976 FARMINGTON ROAD HOLDINGS, L.L.C., Defendant.**

**Civil No. 10–11589.**

United States District Court, E.D. Michigan, Southern Division.

May 13, 2010.

Order Granting Immediate Consideration June 14, 2010.

Opinion Denying Reconsideration June 14, 2010.

Andrew W. Mychalowych, Lindsay K. James, Siciliano, Mychalowych, Farmington Hills, MI, for Plaintiff.

Dennis G. Bonucchi, M. Sheila Jeffrey, Eric C. Bartley, Miller Canfield, Troy, MI, for Defendant.

## OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND DISSOLVING TEMPORARY RESTRAINING ORDER

JOHN FEIKENS, District Judge.

### I. PROCEDURAL HISTORY

This matter is before the court on Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. The case was initially filed in the Circuit Court for the County of Wayne, Michigan, Case No. 10-004441-NZ. Judge John H. Gillis Jr. issued a Temporary Restraining Order ("TRO") on April 15, 2010, and scheduled a hearing for April 21, 2010 to determine whether a preliminary injunction should issue. On April 20, 1010, Defendant Lender properly removed the action to this court on diversity grounds. I extended the effect of the TRO to May 14, 2010, scheduled a hearing for May 13, 2010, and requested supplemental briefing on certain questions. The matter has been fully briefed and a hearing was held on May 13, 2010.

### II. MATERIAL FACTS

#### A. The Original Mortgage And Note To Lehman Brothers

On December 2, 2004, Plaintiff Livonia Properties Holdings, L.L.C. ("Borrower") entered into a $16,300,000 Commercial Mortgage Loan (the "Loan") from Lehman Brothers Bank, FSB ("Lehman Brothers"). The Loan was secured by a Mortgage on four industrial properties in Livonia, Michigan (the "Properties"). The documents executed and delivered by Borrower in connection with the Loan include, but are not limited to, a Promissory Note (the "Note"), Mortgage, and Cash Management Agreement (collectively, the "Loan Documents").

The Loan was disbursed on December 30, 2004, leaving over $5.5 million dollars for Borrower after other disbursements.

#### B. The Initial Assignment(s) To The Trust

On or about January 6, 2005, effective January 11, 2005, Lehman Brothers executed an assignment of the Loan Documents (the "First Assignment"). Borrower alleges, and Lender appears to concede, that the First Assignment was actually accomplished by way of three interim transfers, occurring over approximately one month:

1. On or about January 6, 2005, effective January 11, 2005, Lehman Brothers sold the Loan to Lehman Brothers Holdings Inc. ("LBHI");

2. On or about January 31, 2005,[1] LBHI transferred the Loan to Structured Asset Securities Corporation ("SASC");

3. On or about February 10, 2005,[2] SASC deposited the Loan into the Trust (as defined below).

Ultimately, the Loan Documents were assigned to LaSalle Bank National Association, as Trustee for the registered holders of LB–UBS Commercial Mortgage Trust 2005–C1, Commercial Mortgage Pass-

---

1. According to certain representations in a Pooling and Servicing Agreement ("PSA") effective as of January 11, 2005 (executed February 8, 2005), the transfer from LBHI to SASC occurred pursuant to a Mortgage Loan Purchase Agreement dated January 31, 2005.

The PSA established the Trust and provided for SASC's deposit of certain Loans thereto.

2. The PSA indicates that the Trust's pass-through certificates were to be issued on February 10, 2005.

Through Certificates, Series 2005–C1 (the "Trust"). The documents executed and delivered by Lehman Brothers in connection with the First Assignment include, but are not limited to, an Allonge, an Assignment/Transfer of (Lien of) Mortgage/Deed to Secure Debt/Beneficial Interest Under Deed of Trust ("First Mortgage Assignment"), and an Assignment of Mortgage Loan Documents (collectively, the "First Assignment Documents").

It does not appear that separate assignments were executed to reflect each interim transfer. Instead, the First Assignment Documents, including the First Mortgage Assignment and the Allonge, list Lehman Brothers as Assignor and the Trust as Assignee. Lender suggests that the assignments were executed "in blank"- apparently contemplating the ultimate assignment to the Trust and later filled in to identify the Trust as the Assignee.

The First Mortgage Assignment was recorded with the Wayne County Register of Deeds on November 17,2005.

As discussed more fully below, Borrower argues that the missing interim assignments (reflecting LBHI and SASC as assignees) render the "record chain of title" fatally defective and preclude foreclosure by advertisement by any party.

## C. *Borrower's Payment History*

Beginning in February 2005, Borrower made over $5,000,000 in payments to the Trust, until its default in October, 2009. During this time, Borrower never questioned the validity of the First Assignment.

## D. *The Prenegotiation Agreement*

On December 22, 2009, Borrower entered into a Prenegotiation Agreement

with the Trust. In the Agreement Borrower expressly acknowledged that (a) the Trust was the Holder of the Loan Documents; (b) the Loan Documents "are in full force and effect and are binding on the Borrower in accordance with their terms"; (c) "the Loan Documents continue to constitute Borrower's legal and enforceable obligations"; and (d) Borrower "currently holds no claim against Holder ... by virtue of any action(s) or inaction(s) of Holder or any of its predecessors-in-interest, if any." [3]

## E. *The Loan Acceleration*

On January 14, 2010, due to Borrower's default, the Trust accelerated the maturity of the Note and invoked the default rate of interest, effective as of October 12, 2009. As of January 10, 2010, the amount due and owing on the Loan was $17,846,855.93, including principal, interest, prepayment consideration and late charges.

## F. *The Assignment To Defendant Lender*

On February 17, 2010, the Trust created the Defendant entity ("Lender"). The Loan Documents were assigned to Lender on or about March 3, 2010 by way of, among other documents, a Second Allonge, an Assignment of Mortgage, a General Assignment, and an Assignment of Claims (collectively, the "Second Assignment Documents").

The Assignment of Mortgage (the "Second Mortgage Assignment"), listing the Trust as Assignor and Lender as Assignee, was recorded with the Register of Deeds on March 4, 2010.

Before the hearing on this matter, Lender produced the *originals* of the Loan

---

**3.** Borrower questions Lender's "poor judgment" in attaching the Agreement, claiming it is confidential for all purposes. The court reads the Agreement to indicate that the con-

tent of any negotiations pursuant to this document are confidential, but Borrower cannot avoid the waivers and admissions made within the document itself.

Documents, the First Assignment Documents, and the Second Assignment Documents.

### G. *The Cash Management Agreement*

Under the terms of the Cash Management Agreement, Borrower pledged substantial cash reserves to be held so long as a certain judgment remained unpaid. The agreement was to terminate upon notice to Lender that the judgment was deemed satisfied by a court of competent jurisdiction.

On March 1, 2010, a judge ordered that the judgment was satisfied. On March 4, 2010, Borrower provided notice of satisfaction to Lehman Brothers "and counsel for [Lender]" [4] and requested that the remaining cash reserves be immediately released to Borrower.

Borrower claims that "in excess of $400,000" has been wrongfully withheld. Borrower also contends that, if the funds had been released, it "could have paid those monies toward the debt obligation on the Promissory Note, so that the Note would not be in alleged default, thereby not causing any alleged default on the Mortgage." According to Borrower, then, Lender would have no right to foreclose the Mortgage, by advertisement or judicial process.

Lender notes that, upon an event of default of the Mortgage (which occurred in October 2009), "Lender may apply the Collateral to the payment of the Debt in any order in its sole discretion or for such other purposes as may be authorized under the Loan Documents." Lender argues that because Borrower defaulted seven

months before the judgment was satisfied, Lender was within its rights to apply the funds "in any order in its sole discretion."

### H. *The Foreclosure*

As required by the applicable statutes, on March 24, March 31, April 7, and April 14, 2010, Lender published notices that the Properties would be foreclosed by public auction on April 22, 2010. A notice of foreclosure was also posted on each of the Properties. Borrower makes no allegations of any defect in the notice procedure.

On April 12, 2010, Borrower's counsel notified Lender's counsel that it was challenging certain aspects of Lender's right to foreclose and requesting that Lender "cease and desist from all efforts attempting to sell or convey the properties, by advertisement or otherwise." Borrower's challenges include:

1. The Assignment from Lehman Brothers to the Trust is invalid because:
 a. there is no assignee on the face of the document [5];
 b. the person who executed the Assignment for Lehman Brothers lacked present intent to convey the documents to the Trust because the ink stamp defining the assignee was likely affixed after the assignment was executed; [6]
 c. the assignor also lacked present intent to convey the documents because Exhibit A to the assignment identifies the original mortgage recording date as January 24, 2005, eighteen days after the assignment was executed (on January 6, 2005).

---

**4.** Again, this suggests that Borrower recognized Lender's status as assignee and holder of the Loan Documents.

**5.** The space for the Assignee contains an asterisk, and at the bottom of the page, below the statement [Remainder of Page Intention-

ally Left Blank], the asterisk is used to define the assignee as the Trust.

**6.** Borrower also alleges that whomever affixed the ink stamp defining the Trust as the assignee may have lacked authority to do so.

2. The Assignment from the Trust to Lender is invalid because:
 a. Borrower has no indication that the person executing this assignment had property authority to do so.
3. The Assignment to Lender references only an assignment of the Mortgage, not the Note. Borrower demanded evidence that the Note was also assigned, and physically transferred, to Lender.

Borrower also demanded evidence that the Cash Management Agreement was assigned to Lender, an accounting history regarding the loan, and a copy of the loan application.

On April 13, 2010, Lender responded by disputing Borrower's "validity" arguments. It also offered to make "the original Note, Mortgage, Assignment of Rents, and the necessary assignments" available at the office of Lender's counsel for "the limited purpose of confirming the documents contain the appropriate original signatures." Rather than take Lender up on its offer, Plaintiff filed the instant action.

Borrower now questions the validity of the First and Second Mortgage Assignments in this proceeding. As noted above, in addition to the challenges raised in Borrower's April 12, 2010 letter, Borrower claims that the failure to record interim assignments reflecting LBHI and SASC as assignees renders the record chain of title fatally defective. Borrower states that Lender has no right to foreclosure by advertisement, and such foreclosure should be enjoined.

## III. ANALYSIS

### A. *Standard For Granting An Injunction*

The Supreme Court has stated that "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). *See also Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir.2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."); *Roghan v. Block*, 590 F.Supp. 150, 153 (W.D.Mich.1984), *aff'd* 790 F.2d 540 (6th Cir.1986) ("There is no power the exercise of which requires greater caution, deliberation, and sound discretion, or more dangers in a doubtful case, than the issuance of an injunction.") (citation omitted). "[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir.2000). Thus, Borrower here must affirmatively demonstrate its entitlement to injunctive relief.

A plaintiff seeking a preliminary injunction must establish (1) that he has a strong likelihood to succeed on the merits; (2) that he is likely to suffer irreparable harm without the injunction; (3) that the injunction would not cause substantial harm to others; and (4) that an injunction is in the public interest. *Winter*, 129 S.Ct. at 374; *ACLU of Ky. v. McCreary County, Ky.*, 354 F.3d 438, 445 (6th Cir.2003). Although the factors are to be balanced, a finding that there is no likelihood of irreparable harm, *Winter*, 129 S.Ct. at 375, or no likelihood for success on the merits, *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir.2000), is usually fatal.

### B. *Likelihood Of Success*

To establish a likelihood of success, a plaintiff must, "at a minimum, show[ ]

serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.,* 119 F.3d 393, 400 (6th Cir.1997) (quotation and citation omitted).

■ In Michigan, the right to foreclosure by advertisement is statutory. Such foreclosures, however, "are a matter of contract, authorized by the mortgagor, and ought not be hampered by an unreasonably strict construction of the law." *Church & Church, Inc. v. A–1 Carpentry,* 281 Mich.App. 330, 766 N.W.2d 30, 36 (2008).

Borrower has raised a claim for declaratory relief with regard to Lender's standing and authority to foreclose by advertisement under M.C.L. § 600.3204. Essentially, Borrower asserts four "defects" to Lender's right to foreclose by advertisement: (1) Lender has not provided evidence that it physically possesses the Note; (2) technical defects in the First and Second Mortgage Assignments render them invalid; (3) because two alleged assignments of the Mortgage (to LBHI and SASC) are not recorded with the Register of Deeds, Lender cannot establish the requisite record chain of title; and (4) Lender allegedly breached the Cash Management Agreement by failing to release certain funds to Borrower, without which breach, Borrower claims it would not be in default or subject to foreclosure. Borrower also asserts trespass to chattels and conversion claims based on the same alleged defects.

Because Borrower's trespass to chattels and conversion claims rely on similar analysis, I will begin with a review of Borrower's claim for declaratory relief.

### 1. Borrower Has Not Established A Likelihood Of Success On The Declaratory Action Claim

Michigan's foreclosure-by-advertisement statute permits a party to foreclose by advertisement if (in relevant part):

(1) ... (a) A default in the condition of the mortgage has occurred, by which the power to sell became operative;

(d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage; and

(3) If the party foreclosing a mortgage by advertisement is not the original mortgagee, a record chain of title shall exist prior to the date of sale ... evidencing the assignment of the mortgage to the party foreclosing the mortgage.

M.C.L. § 600.3204(1) and (3).

#### a. Borrower Does Not Dispute That It Is In Default

Lender alleges that Borrower has failed to make payments on the Loan from October 11, 2009 to the present. Lender accelerated the maturity of the Note and demanded payment in full by Demand Letter dated January 14, 2010. According to Lender, the amount due and owing on the Loan as of April 15, 2010 was $18,112,138.80, representing the accelerated principal, interest, prepayment consideration, late charges, and fees.

Because Borrower has offered no evidence to dispute these facts, Lender has satisfied condition (1)(a).

#### b. Lender Offers Sufficient Proof That It Is The Owner Of The Indebtedness

Borrower argues that Lender cannot satisfy condition (*l*) (d)—that it owns the indebtedness or an interest in the indebtedness—because it has not provided proof

that it is in physical possession of the original Note. Borrower cites *Davenport v. HSBC Bank USA,* 275 Mich.App. 344, 739 N.W.2d 383 (2007), claiming that Lender's failure to provide such evidence "is a structural defect that goes to the very heart of defendant's ability to foreclose by advertisement." That case is distinguishable. In *Davenport,* the foreclosing bank published the notice of foreclosure *before* it was assigned any rights in the mortgage. The court explained that, where the defendant did not own an interest in the mortgage when it commenced foreclosure proceedings, those proceedings were void. In the instant case, the Second Mortgage Assignment to Lender was recorded with the Register of Deeds on March 4, 2010, and the notice of foreclosure was first published on March 24, 2010. Thus, Davenport is inapposite to the issues in this case.

■ Nevertheless, I agree with Borrower's basic premise that before Lender can initiate foreclosure proceedings, it must establish that it owns the indebtedness.

Lender has offered testimony by affidavit of David H. Smith[7] that Lender is currently the holder of the Note, Mortgage, and all other Loan Documents, and the First Assignment Documents and Second Assignment Documents. Smith also stated that the Loan Documents, First Assignment Documents, and Second Assignment Documents are true and authentic copies of the original respective documents. Finally, Lender produced the original of each relevant document before

the hearing on May 13, 2010. The Court has examined those documents and compared them to copies of the same that each party attached to its court filings.[8] In addition, the Court compared each recorded document with the corresponding copy that Plaintiff independently obtained from the county recorder. The Court's review demonstrates that Defendant is in possession of the authentic original documents. The originals bear original signatures in a variety of inks, original recording stamps (and in some cases, original receipts from the recording), affixed stickers identifying the Trust as the assignee, raised notary seals, and all "imperfections"—such as cross-outs and stray marks-that were visible on the copies. The Court has no reason to question the authenticity of the documents and is satisfied that they appear authentic on their face. Accordingly, Defendant has established that it is the holder of the indebtedness.[9]

Arguing in the alternative, Borrower cites numerous cases for what it purports to be the "majority rule" that "if there is sufficient space on a note for endorsement, one does not become a holder in due course if the purported assignment or transfer is pursuant to an allonge."

As Borrower acknowledges, endorsement of a negotiable instrument is governed by M.C.L. § 440.3204. A 1993 amendment to that section added the sentence, "For the purpose of determining whether a signature is made on an instrument, a paper affixed to the instrument is

---

7. David H. Smith is a Senior Vice President for CWCapital Asset Management LLC ("CWCapital"). CWCapital is the Special Servicer for the Trustee of the Trust. The Trust is the sole member of Lender.

8. Plaintiff has raised no authenticity-based objections to the previously-available copies, instead challenging only whether Defendant was in physical possession of the originals.

9. Borrower argued that, if Lender could not establish its physical possession of the Note, "the party that took *actual* assignment of the Note could still sue [Borrower] for the entire debt." (Motion at 8–10). Because Lender has established its possession, Borrower is no longer at risk of any action for double-recovery by a non-holder. M.C.L. § 440.3602 (providing that any payment to a 'person entitled to enforce the instrument' must be credited against the note).

part of the instrument." M.C.L. § 440.3204(1). The commentary to that section explains, "[a]n indorsement on an allonge is valid even though there is sufficient space on the instrument for an indorsement."

■ Thus, regardless of any purported majority rule, an Allonge affixed to a Note effectively negotiates the instrument without regard to space remaining on the original instrument.

Finally, Borrower argues that the allonges were ineffective because they were not "affixed" to the Note. Under Michigan law, an allonge "affixed" to a note becomes "part of the instrument." M.C.L. § 440.3204(1).[10] Borrower cites two non-binding state court decisions from other jurisdictions in support of its argument. The Court's independent research identifies no Michigan or Sixth Circuit authority establishing the method of attachment necessary to create an effective endorsement.

■ In this case, the allonges presented to the Court were attached to the Note; the First Allonge states that it "forms a part of that Promissory Note dated December 30, 2004 made by" Borrower to Lehman Brothers; and the Second Allonge states that it is "to be attached to, modify, and be a part of that certain Promissory Note ... dated effective December 30, 2004, made by [Borrower] payable to the order of [Lehman Brothers]." In these circumstances, given the clear intent that the Note and Allonges were to be physically attached, the evidence is insufficient to invalidate the endorsements. *See In re Nash,* 49 B.R. 254, 261 (Bankr. D.Ariz.1985).

### c. Lender Has Established A Record Chain Of Title

Borrower next argues that Lender cannot satisfy condition (3) because it "has not produced evidence of an unbroken chain of assignments of the Mortgage, beginning with Lehman Brothers and ending with [Lender]." Although Borrower's search of the Register of Deeds revealed assignments from Lehman Brothers to the Trust, and from the Trust to Lender, Borrower alleges that two interim assignments have not been recorded, precluding Lender from satisfying M.C.L. § 440.3204(3). Borrower also challenges the validity of the recorded assignments based on certain technical defects.

### (1) The Unrecorded Assignments Do Not Prevent Lender From Foreclosing By Advertisement

Borrower asserts that two interim assignments exist, neither of which were recorded with the Register of Deeds. Citing *Arnold v. DMR Financial Services,* 448 Mich. 671, 532 N.W.2d 852, 855–56 and n. 7 (1995), Borrower claims that the absence of these assignments in the county record prohibits foreclosure by advertisement. Notably, however, *Arnold* holds that a mortgagee's failure to record an assignment to a third party as security did not render foreclosure by advertisement void:

> In *Feldman* [*v. Equitable Trust Co.,* 278 Mich. 619, 270 N.W. 809, 810–11 (1937)], this Court held, and we hold again that [the foreclosure by advertisement statute] provided that only the record holder of the mortgage could foreclose by advertisement, and the mortgagor was not

10. The previous version of this rule, then in M.C.L. § 440.3202, required an allonge to be "so firmly affixed [to the Note] as to become a part thereof." A 1993 amendment rewrote this section, which now requires only that the allonge be "affixed." The change in language suggests an intent to expand, rather than re-

strict, the use of allonges. *Cf. Estrada v. River Oaks Bank & Trust Co.,* 550 S.W.2d 719, 728 (Tex.Civ.App.1977) (finding the reverse change—from "attached" to "so firmly affixed ... as to become a part thereof—evidenced a clear intent to restrict, rather than expand, the use of allonges.)."

affected by the fact that others had an unrecorded interest in the mortgage. . . . [T]he existence of equitable rights in the mortgage by persons other than the person who had legal title alone did not create a valid objection on behalf of the mortgagor if the mortgagor was unaffected by those interests. *Id.* at 676–78, 532 N.W.2d 852 (emphasis added).

Although Borrower argues that the holding of *Arnold* is limited to unrecorded assignments for security purposes only, the Michigan Supreme Court addressed unrecorded assignments for the purpose of establishing a trust in *Peterson v. Jacobs,* 303 Mich. 329, 6 N.W.2d 533 (1942). In Peterson, an interim holder held an assignment of a loan for eight months before depositing it into a trust. The assignment to that interim entity was never recorded. The court stated that "[i]t would have been perfectly useless and serve no good purpose to mention the assignment and reassignment unless such legal formalism is mandatory." *Id.* at 536. It then upheld the foreclosure sale, explaining that the statutory requirements need only substantial compliance. "Slight and inconsequential irregularities"—including the failure to record the short-term interim assignment—did not invalidate the foreclosure by advertisement. *Id.*

■ In this case, the allegedly missing assignments were held by two entities for a combined total of *one month* (on or about January 6, 2005, to February 8, 2005), far less than the period at issue in Peterson. Borrower has not been affected by any failure to record assignments to those entities. Lender has established a record chain of title from the original mortgagor (Lehman Brothers) to Lender. The chain

of title, which substantially complies with the foreclosure by advertisement statute, establishes Lender as the only entity with a right to foreclose by advertisement.

### *(2) Borrower Lacks Standing To Challenge Validity Of The Assignments*

■ Borrower disputes the validity of the assignment documents on several grounds outlined above. But, as a nonparty to those documents, it lacks standing to attack them.

Apart from the minimum constitutional requirements for standing, the Supreme Court recognizes other "prudential limitations" on the question of standing. *Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Among these limitations, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.*

Lender argues that under principals of basic contract law, a non-party to a contract does not have the right to challenge the validity of the contract unless it is a third-party beneficiary to that contract. Borrower counters, without authority, that although as a non-party it cannot *enforce* a contract, Borrower only seeks to "prevent a sale of property" through "examination of the validity of the assignments." (Pl. Reply, Dkt. 20 at 5). Effectively, Borrower seeks to *prevent enforcement* of the assignments—despite the fact that the parties have affirmed their validity.[11]

Borrower certainly has an interest in avoiding foreclosure. But the validity of the assignments does not effect *whether* Borrower owes its obligations, but only to *whom* Borrower is obligated. Although a

---

11. By way of affidavit, William Walenczyk, Senior Vice President of Aurora Bank FSB f/k/a Lehman Brothers expressly affirmed the validity of the transfer to the Trust. And David H. Smith, Senior Vice President of CWCapital, the Special Servicer for the Trust, affirmed the validity of the transfer from the Trust to Lender.

debtor may assert certain defenses that render an assignment absolutely invalid (such as nonassignability of the right assigned), he generally may not assert any ground which may render the assignment voidable "because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure him or herself that he or she will not have to pay the same claim twice."[12] 6A C.J.S. Assignments § 132. A debtor, for example, cannot raise alleged acts of fraud, or question the motive or purpose underlying an assignment. *Id.*

In *Pashak v. Interstate Highway Construction, Inc.*, No. 189886, 1998 WL 2001203 (Mich.App. Mar. 20, 1998), the Michigan Court of Appeals held that a lessee lacked standing to challenge the validity of the lessor's assignment of its interest in the lease:

> Although [lessee] challenges the validity of the assignment [of the lease] as between [the assignor] and [the assignees], we find that it lacks standing to do so where the parties to the assignment ... do not contest its validity.

*Id.* at *1 (citing *Woods v. Ayres*, 39 Mich. 345 (1878) (holding that where the parties to an assignment act in accordance with the assignment, and there is no evidence that either party to the assignment objects so as to create a hostile title, a third-party to the assignment cannot challenge its validity)).

And in *Bowles v. Oakman*, 246 Mich. 674, 225 N.W. 613 (1929), the Michigan Supreme Court held that a maker of a note may not attack the validity of a transfer of that note:

> The fraud of [the assignee] did not render the transfer void. It was at most voidable at the instance of those defrauded. Plaintiff was the holder of the note, and had title to it at the time of trial. . . .
>
> [Debtor] had no defense of his own to the note. He [may not defend on the grounds that] an indorsee had been guilty of fraud upon the payee or the equitable owners. An adjudication upon such defense would not bind the persons defrauded, as they are not parties hereto, and it would be idle. This action is by the person having legal title to the note. A judgment herein is conclusive. It makes no difference to [the payor] who may have equitable title to the note, as he has no defense on the merits.

*Id.* at 614. The court also quoted *Gamel v. Hynds*, 34 Okla. 388, 125 P. 1115 (1912), with approval:

> The assignor or indorser on negotiable instruments must protect his own interest, where he had been induced to assign or indorse through fraud; and **the maker cannot defend or set up matters of defense which only exist between the indorser and indorsee.**
>
> **The maker of a promissory note cannot, in an action brought against him by the indorsee or transferee thereof, litigate questions that can properly arise only between the holder and his immediate indorser.**

*Id.* (emphasis added).

Michigan's Commercial Code also recognizes that, except in limited circumstances not applicable here, an obligor of a negotiable instrument may not assert the defenses of another, including the assignor of the instrument. M.C.L. 440.3305(3) ("the obligor may not assert against the person entitled to enforce the instrument a defense ... of another person").

In fact, for over a century, state and federal courts around the country have applied similar reasoning to hold that a

---

**12.** As noted above, because Lender has established that it holds the original Note, Borrower is not at risk of paying the same claim twice.

litigant who is not a party to an assignment lacks standing to challenge that assignment. For example, in *Ifert v. Miller*, 138 B.R. 159 (Bankr.E.D.Pa.1992), the court explained that an obligor lacks standing to challenge an assignment:

> [The underlying contract] is between [Obligor] and [Assignor]. [Assignor's] assignment contract is between [Assignor] and [Assignee]. The two contracts are completely separate from one another. As a result of the assignment contract, [Obligor's] rights and duties under the [underlying] contract remain the same: The only change is *to whom* those duties are owed.... [Obligor] was not a party to [the assignment], nor has an cognizable interest in it. Therefore, [Obligor] has no right to step into [Assignor's] shoes to raise [its] contract rights against [Assignee]. [Obligor] has no more right than a complete stranger to raise [Assignor's] rights under the assignment contract.

*Id.* at 166 n. 13 (applying Texas law). The same analysis applies here. The Loan Documents are between Borrower and Lehman Brothers. The assignments are between (some combination of) Lehman Brothers, LBHI, SASC, the Trust, and Lender. After the assignments, Borrower's rights and duties under the Loan Documents remain the same, the only change being *to whom* those duties are owed. Borrower cannot now step into the shoes of an assignor to assert its contract rights. *See also Liu v. T & H Mach., Inc.*, 191 F.3d 790 (7th Cir.1999) (party to underlying contract lacks standing to "attack any problems with the reassignment" of that contract); *Blackford v. Westchester Fire Ins. Co.*, 101 F. 90 (8th Cir.1900) ("As long as no creditor of the assignor questions the validity of the assignment, a debtor of the assignor cannot do so."); *Byczek v. Boelter Cos.*, 230 F.Supp.2d 843 (N.D.Ill.2002) (same); *Nicolls Pointing Coulson, Ltd. v. Transp. Underwriters of La., Inc.*, 777

F.Supp. 493 (E.D.La.1991) ("a debtor cannot challenge an assignment of a debt by a creditor unless he can show he is prejudiced by the assignment"); *The Prussia*, 100 F. 484 (D.C.Wash.1900) (holding the validity of an assignment cannot be collaterally attacked on the ground of alleged technical irregularities by a non-party to the assignment, where no objection is made by the assigning entity); *In re Holden*, 271 N.Y. 212, 2 N.E.2d 631 (1936) ("The assignments were valid upon their face. The assignee was the legal owner of the claims assigned. No one could question the validity of the assignments except the assignors."); *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith P'ship*, No. 08–07–00090, 323 S.W.3d 203, 2010 WL 450910 (Tex.App. Feb. 10, 2010) (finding lessor lacked standing to challenge assignment of lessee's breach of lease action because lessor was not party or third-party beneficiary to assignment contract); Richard A. Lord, 29 Williston on Contracts § 74:50 (4th Ed.) ("**the debtor has no legal defense [based on invalidity of the assignment] ... for it cannot be assumed that the assignee is desirous of avoiding the assignment.**") (emphasis added).

In light of these compelling authorities, I hold that Borrower may not challenge the validity of assignments to which it was not a party or third-party beneficiary, where it has not been prejudiced, and the parties to the assignments do not dispute (and in fact affirm) their validity.

*(3) Even if Borrower Could Challenge The Assignments, It Is Not Likely To Succeed On The Merits*

I offer a brief discussion of Borrower's likelihood of success on the merits, should Borrower have been permitted to challenge the validity of the assignments. First, Lender submits that Borrower made over $5,000,000 in payments to the Trust without questioning whether it was paying

to the appropriate entity. It was only *after* Borrower defaulted, and a foreclosure sale was imminent, that Borrower raised supposed irregularities in the Assignments. And as recently as December 22, 2009, Borrower expressly acknowledged that "the Loan Documents are in full force and effect and are binding on [Borrower] in accordance with their terms", "the Loan Documents continue to constitute [Borrower's] legal and enforceable obligations", and "[Borrower] . . . currently holds no claim against Holder." Therefore, even if Borrower was permitted to challenge the validity of the assignments, Lender would appear to have valid defenses of laches, estoppel, waiver, and/or ratification sufficient to rebut Borrower's challenges at this stage in the proceedings.

Next, Borrower argues that the Trust was not created at the time the Assignment to it was executed and thus the assignment should be declared void. Lender explains that the Pooling and Service Agreement, which established the Trust, is dated "as of January 11, 2005"—the effective date of the Assignment to the Trust. Even if the Trust was created later, as Borrower suggests, Lender would appear to have valid counter arguments that the assignments are valid under the *de-facto*-corporation or corporation-by-estoppel doctrines, or that the parties to the Assignments ratified or adopted the contract(s) after the Trust was formed. *See, e.g., Duray Dev., LLC v. Perrin,* 288 Mich. App. 143, — N.W.2d ——, 2010 WL 1461616 (2010). Ratification or adoption, including by complete performance by the parties, also would appear to "cure" any alleged defects caused by persons executing the contracts without proper authority.[13]

■ Finally, to the extent Borrower argues that Lehman Brothers' failure to identify an assignee at the time it executed the assignment defeats the requisite "present intent" to make a transfer, the law permits assignment in blank, which authorizes the transferee/holder to fill in the blanks with terms consistent with the parties' intent. *See, e.g., McCurdy v. Van Os,* 290 Mich. 492, 287 N.W. 890 (1939) (holding assignment in blank sufficient to release assignor, where bank (purported assignee) took possession of assignment and related original documents and exercised control over property consistent with having released assignor from obligations); *Mason Lumber Co. v. Collier,* 74 Mich. 241, 41 N.W. 913 (1889) ("an assignment, like the one in question here, if filled in with the name of an assignee, after deliver[y] in blank, with the consent of the assignor, would become operative and valid in the party whose name was thus inserted."); M.C.L. § 440.3115 (an incomplete instrument may be completed according to its terms, as augmented with authority of the signer; **the burden of establishing that additions are without authority is on the person asserting the lack of authority**). That all parties to

---

13. Without citing authority, Borrower claims that David H. Smith lacked authority to execute the Second Mortgage Assignment from the Trust to Lender. For this proposition, Borrower relies exclusively on the absence of Smith's name from CWCapital's Certificate of Organization. Under Massachusetts Law, a recordable instrument affecting an interest in real property executed in the name of a limited liability company by any person identified on the Certificate of Organization "shall be binding on the limited liability company."

M.G.L. 156C § 66. Although this conclusively establishes the authority of any person named on the Certificate to execute real-property instruments, it does not establish that a person *not named* on that Certificate lacks authority. This would seem to be especially true when the executed instrument does not affect *CWCapital's interest* in real property, but rather an interest of an entity for which CWCapital serves as Special Servicer, as in the instant matter.

the assignments acted as though they were valid—including physically transferring the original documents to each successor assignee—would appear to defeat Borrower's intent-based arguments without the need to reconstruct history or conduct extensive discovery against non-parties to this action.

### 2. Borrower Has Not Established A Likelihood Of Success On Its Remaining Claims

#### a. Trespass To Chattels And Conversion

■ "A trespass to chattels is actionable if one dispossesses another of or intentionally and harmfully interferes with another's property." *Mackie v. Bollore S.A.*, No. 286461, 2010 WL 673295 (Mich. App. Feb. 25, 2010).

Conversion is generally defined as "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 486 N.W.2d 600 (1992).

■ In its Complaint, Borrower argues that Lender's allegedly wrongful efforts to foreclose form the basis for these claims by "interfer[ence] with" and "exertion of wrongful dominion over" Borrower's "Properties." Borrower has cited no authority to suggest that a foreclosure of *real property*, even if wrongful, can satisfy these *personal-property-based* claims. Nevertheless, because Borrower has not shown substantial likelihood of success on is declaratory judgment action based on the same allegations, it cannot show a likelihood of success on these claims.

#### b. Breach Of Contract

Borrower alleges that Lender breached the Cash Management Agreement by failing to release certain funds, in violation of Paragraph 12 of that agreement (describing certain termination events). Borrower claims it provided the proof required to terminate the agreement and release the funds on March 4, 2010, but Lender has refused to tender or otherwise account for the funds. Borrower further alleges that it "could have paid those monies toward the debt obligation . . . so that the Note would not be in alleged default, thereby not causing any alleged default on the Mortgage . . . [leaving Lender] no right to foreclose the Mortgage."

Lender notes that Paragraph 9 of the Cash Management Agreement permits the Lender to "apply the Collateral to the payment of the Debt in any order in its sole discretion" if an Event of Default occurs. Because Borrower defaulted on the loan in October 2009, and the debt was accelerated in January 2010, Lender argues that Borrower was the first to breach and cannot maintain an action against based on Lender's alleged subsequent breach or failure to perform. *See Flamm v. Scherer*, 40 Mich.App. 1, 198 N.W.2d 702 (1972).

■ Borrower does not dispute this, and appears to concede that by the time Lender allegedly breached the Cash Management Agreement, the debt had been accelerated due to Borrower's prior default. The balance due and owing as of January 14, 2010, was over $17,000,000. Even if Lender had released the funds, Borrower would have been unable to cure its default.

Accordingly, Borrower has not shown a likelihood of success on the merits on this claim.[14]

---

14. Even if Borrower could succeed on this breach of contract claim, it could not show irreparable harm because money damages would be a sufficient remedy. *See Basicomputer Corp, infra.*

## C. *Likelihood Of Irreparable Harm*

With respect to the this factor, the harm that would result in the absence of the injunction must be irreparable, not merely substantial. As the Supreme Court has noted,

> The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (citation omitted).

In evaluating the harm facing the plaintiffs, the court must evaluate three factors: "(1) the substantiality of the injury alleged, (2) the likelihood of its occurrence, and (3) the adequacy of the proof provided." *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir.1987). In establishing the harm, a movant must provide record evidence, such as facts and affidavits, from which the court can make specific findings. *Id.* at 290–91. "[A] plaintiff's harm is not irreparable if it is fully compensable by money damages." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir.1992).

Borrower submits, without supporting evidence or authority, that "the value of losing its real property (along with established tenants who have leases), the significant tax consequences to [Borrower] if there were a sale, and the loss of goodwill is hard to calculate and cannot be compensated alone with money damages." (Dkt. 15 at 19). Borrower also states without authority that:

> the power to redeem will not return [Borrower] to the status quo, because the tax consequences of the sale cannot be undone; nor can one say with any certainty that [Borrower] will be able to retain its tenants with the specter of a transfer of the property to the new owners looming; nor can one say that [Borrower] will be able to recover its goodwill with the black eye of foreclosure looming .... Moreover, the financing terms of the loan which allow payment over time at a desirably low interest rate (the Note does not mature until January 2015) will have been lost.

(*Id.* at 20).

Lender argues that Borrower "has been damaged by its own default in failing to make payments as required by the Loan Documents since October 2009, not by any loss caused by Lender's pending foreclosure." Moreover, Lender submits that Michigan's six-month statutory redemption period is an adequate remedy at law sufficient to deny injunctive relief. (Dkt. 16 at 7) (citing *Dumas v. Helm*, 15 Mich.App. 148, 166 N.W.2d 306, 309 (1968) ("The rights of redemption provided for in foreclosure matters provide defendants with adequate relief")).

It appears that many of Borrower's alleged harms are self-inflicted or speculative-neither of which satisfy the irreparable harm requirement. *See* 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE CIV. § 2948.1 (2d ed.) ("Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted."; "Speculative injury is not sufficient."). With the debt having been accelerated due to Borrower's admitted default, Borrower already has lost its "desirably low interest rate." Similarly, the "black eye of foreclosure" is looming because of Borrower's default, not Lender's actions or any allegedly defective assignment. And Borrower has provided no evidence of a likelihood of

loss of goodwill sufficient to justify an injunction.

Finally, because Borrower is permitted to redeem after the sale, it has not shown that irreparable harm will occur at the time of the foreclosure sale. *Sayo v. Zions First Nat. 7 Bank*, No. 06–14963, 2006 WL 3392072 (E.D.Mich. Nov. 22, 2006) (rejecting loss-of-goodwill arguments, finding redemption period adequate remedy, and denying motion to enjoin foreclosure); *see also Dumas, supra.*

### D. Harm To Others And Public Interest

Lender alleges that the present delay in the foreclosure harms it in the amount of $3,595 in lost interest each day, plus legal expenses and attorneys' fees.

In terms of public policy, as Judge Hood explained in *Sayo, supra:*

> there are public policy arguments in favor of both sides of the dispute. Public policy disfavors the sale of real property through foreclosure auctions, but also favors parties to honor contractual agreements, such as the Mortgage Agreement in this case.

### E. Balancing The Factors

The critical first and second factors weigh in favor of Lender. Borrower cannot demonstrate that it will succeed on the merits or suffer irreparable harm caused by the failure to issue an injunction. As to the third factor, Borrower has not shown that its harms decidedly outweigh Lender's harms. And, because Borrower contractually agreed to the foreclosure-by-advertisement remedy, public policy does not favor permitting Borrower to escape its contractual obligations, especially where it cannot satisfy the other factors.

The court will not issue a preliminary injunction to prevent Lender from foreclosing by advertisement.

## IV. CONCLUSION

Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Dkt. 1, Attachment # 3) is DENIED with prejudice; and

Wayne County Circuit Court's April 15, 2010 Temporary Restraining Order, extended by Order Extending Effect of Temporary Restraining Order (Dkt. 14) is DISSOLVED.

**IT IS SO ORDERED.**

*ORDER GRANTING PLAINTIFF'S MOTION FOR IMMEDIATE CONSIDERATION [Dkt. 33] AND DENYING PLAINTIFF'S MOTION FOR CERTIFICATION OF QUESTION TO THE MICHIGAN SUPREME COURT OR ALTERNATIVELY FOR CERTIFICATION FOR IMMEDIATE APPEAL AND MOTION FOR STAY [Dkt. 32]*

Plaintiff has asked that this Court immediately consider two motions: Plaintiff's Motion for Reconsideration of the Court's Opinion and Order Denying Plaintiff's Motion for Preliminary Injunction And Dissolving Temporary Restraining Order (Dkt. 30) and Plaintiff's Motion for Certification of Question to the Michigan Supreme Court Pursuant to M.C.R. 7.305(B) or Alternatively For Certification For Immediate Appeal Pursuant to 28 U.S.C. § 1292(b) and Motion for Stay. (Dkt. 33.) Specifically, Plaintiff asks that this Court issue decisions on these orders prior to a foreclosure sale scheduled to occur on June 16, 2010. Plaintiff's Motion for Immediate Consideration is GRANTED.

Plaintiff requests that I certify two questions to the Michigan Supreme Court pursuant to M.C.R. 7.305(B). As Judge Steeh explained,

> This court may certify an issue to the Michigan Supreme Court for resolution

of a question of Michigan law not controlled by Michigan Supreme Court precedent. Certification of an unresolved issue [by] a state supreme court is not obligatory, but instead lies within the federal court's discretion.

*Pack v. Damon Corp.*, No. 03–73601, 2006 WL 1109100 at *1 (E.D.Mich. Apr. 25, 2006).

■ At this stage in the proceedings, this Court *only* has ruled on whether it is appropriate to issue a preliminary injunction preventing Defendant from foreclosing by advertisement. As discussed in my original Order denying that injunction (Dkt. 24) and in my Order entered today denying Plaintiff's motion for reconsideration of the original Order, I denied the injunction because Plaintiff failed to establish a likelihood of success on the merits and *also* failed to establish a likelihood of irreparable harm. The questions Plaintiff now seeks to resolve would address only the first of those reasons, but would not remedy Plaintiff's failure to demonstrate irreparable harm and thus would not alter the outcome of my earlier decisions or justify the imposition of a injunction in this case. Under these circumstances, and because Plaintiff has recourse though interlocutory appeal to the Sixth Circuit as discussed below, I am not persuaded that certification to the Michigan Supreme Court is necessary or appropriate at this time.

■ Next, Plaintiff requests certification of appeal to the Sixth Circuit pursuant to 28 U.S.C. § 1292(b) of my Order denying a preliminary injunction and my denial of reconsideration of that Order. Because Plaintiff may directly appeal a denial of an injunction pursuant to 28 U.S.C. § 1292(a)(1) (authorizing appeal of "[i]nterlocutory orders of the district courts . . . granting, continuing, modifying, refusing or dissolving injunctions"), the requested certification is unnecessary.

■ Finally, Plaintiff requests that I enter a stay of these proceedings pending its appeal. Because I have declined to enter a preliminary injunction, however, a stay would operate to delay proceedings with respect to Plaintiff's underlying Complaint, but would not serve to enjoin Defendant from proceeding with its foreclosure by advertisement (which, as Plaintiff notes, is not a judicial proceeding before this Court or any other). And, as I have repeatedly explained, because Plaintiff has not demonstrated a likelihood of success on its claims or irreparable harm likely to occur if the foreclosure by advertisement proceeds, I *again* decline to enter an injunction preventing that foreclosure or otherwise stay these proceedings.

Plaintiff's Motion for Immediate Consideration (Dkt. 33) is GRANTED; and

Plaintiff's Motion for Certification of Questions and for a Stay (Dkt. 32) is DENIED.

**IT IS SO ORDERED.**

*OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION [Dkt. 30]*

### I. INTRODUCTION

Plaintiff seeks reconsideration of this Court's Opinion and Order Denying Plaintiff's Motion for Preliminary Injunction and Dissolving Temporary Restraining Order (Dkt. 24). As Plaintiff correctly notes, to succeed on a motion for reconsideration, the moving party must demonstrate both a palpable defect and that a different disposition of the case will result from a correction of that defect. E.D. Mich. LR 7.1(h)(3). Although Plaintiff asserts certain challenges regarding its likelihood of success on the merits, it fails to challenge the Court's finding that "because Borrower is permitted to redeem after the sale, it has not shown that irreparable harm will occur at the time of the foreclosure sale." (Dkt. 24 at 24). And, as I noted in my original Order, "a finding that there is no

likelihood of irreparable harm ... is usually fatal." (*Id.* at 8). Thus, regardless of any alleged "palpable defect", Plaintiff has not satisfied the requirements for a motion for reconsideration, and this Motion is therefore denied. Nevertheless, because the factors for granting an injunction must be balanced, I will address the Plaintiff's arguments regarding its likelihood of success.

## II. ANALYSIS

Plaintiff raises several purported defects in my original Order: (1) the Court was misled with respect to the record chain of title; (2) the Court improperly found that allegedly-unrecorded-interim assignments do not create a defect in the record chain of title sufficient to prevent foreclosure by advertisement; (3) Defendant has not demonstrated adherence to all contracts providing for the assignment of the Mortgage and Note to each subsequent assignee; (4) Defendant has not demonstrated that the Trust was in existence at the time the Mortgage and Note were assigned to it; and (5) the Court improperly found that Plaintiff lacks standing to challenge the assignments.

First, a note about Plaintiff's standing. Plaintiff, as a mortgagor subject to foreclosure by advertisement, certainly has standing to challenge whether Defendant has complied with the statutory requirements for that foreclosure. But it does not have standing to go beyond the statutory requirements to inspect each and every aspect of every contract or agreement between any predecessor and successor mortgagee, searching for "irregularities" and noncompliance. As Plaintiff acknowledges,[1] and as I previously explained in

great detail, Plaintiff cannot avoid its contractual obligations under the Loan Documents (including the *contractual* right of foreclose by advertisement contained within the Mortgage) by arguing that the assignments of those documents were invalid or ineffective.[2] Thus, if Defendant has complied with the required statutory mandates and Defendant is the holder of Plaintiff's Note and Mortgage, it has the contractual and statutory right to foreclose by advertisement, and this Court will not enjoin Defendant from doing so.

■■■ Foreclosure by advertisement is "a matter of contract, authorized by the mortgagor, and ought not to be hampered by an unreasonably strict construction of the law." *Church & Church, Inc. v. A–1 Carpentry,* 281 Mich.App. 330, 766 N.W.2d 30, 36 (Mich.App.2008); *National Airport Corp.,* 73 Mich.App. 572, 252 N.W.2d 519, 521 (Mich.App.1977) ("The power is part of the contract, and should be construed on principles applicable to contracts, and not as a hostile process.") (quoting *Reading v. Waterman,* 46 Mich. 107, 8 N.W. 691, 692 (Mich.1881)). The Michigan Supreme Court has explained that substantial compliance with the statutory requirements for foreclosure by advertisement is all that is required:

> The statutes were *intended to prevent surprise or unfairness,* and they should be enforced in everything substantial. Courts cannot disregard any of their positive provisions. But on the other hand those provisions cannot be enlarged or unreasonably construed so as to render mortgage sales unsafe, or to make bidding hazardous. *The law was designed to encourage and not to de-*

---

**1.** Plaintiff admits it "does not challenge the underlying obligation." (Pl. Mot. for Recons. at 18).

**2.** *See* Dkt. 24 at 15 ("Borrower certainly has an interest in avoiding foreclosure. But the

validity of the assignments does not effect *whether* Borrower owes its obligations, but only to *whom* Borrower is obligated."); *id.* at 17 ("Borrower cannot now step into the shoes of an assignor to assert its contract rights.").

*stroy recourse to these simple and cheap remedies; and while no substantial right should be disregarded, substantial regularity is all that should be [required].*

*Reading,* 8 N.W. at 692 (emphasis added).

In *Peterson v. Jacobs,* the Michigan Supreme Court addressed whether a defect in the statutory requirements for foreclosure by advertisement rendered a foreclosure sale invalid. In that case, the plaintiff argued that the statute required a foreclosure notice to describe the names of every mortgagor and mortgagee, *"irrespective of whether there was a complete and duly recorded reassignment by such assignee, or not."* 303 Mich. 329, 6 N.W.2d 533, 535 (Mich.1942) (emphasis added). The Court found that failure to mention assignments to and from an interim assignee, who held the mortgage for "some eight months," was not such a substantial irregularity as to render the foreclosure by advertisement void. *Id.* at 535–36.

Plaintiff argues that *Peterson* was decided pursuant to a prior version of the statute, which did not require "a record chain of title." As Plaintiff so aptly notes, however, the then-existing statute did require "a recording of the mortgage, and all assignments." (*See* Pl. Mot. for Recons. at 13 (citing *Feldman v. Equitable Trust Co.,* 278 Mich. 619, 625, 270 N.W. 809 (Mich. 1937))). Thus, while the language of the statute has changed, the requirement that the mortgage and assignments be recorded remains the same.[3]

Plaintiff next argues that when the *Peterson* court "announced" the rule that the foreclosure-by-advertisement statute requires only "substantial compliance," it referred only to the foreclosure notice.[4] I do not read *Peterson* so narrowly. The *Peterson* court based this "announcement" on the general principle that statutory foreclosures are matters of contract that "ought not be hampered by an unreasonable construction of the law." *Id.* at 535. Moreover, because the *Peterson* court considered the need to publish notice of assignments "whether ... complete and duly recorded ... or not," its holding implicitly recognizes that (1) mortgages may be validly "assigned" without a "complete and duly recorded" assignment document; and (2) those assignments do not prevent foreclosure by advertisement so long as they do not prevent "substantial compliance" with the statute.[5] These implicit findings

---

**3.** In fact, as Defendant correctly notes, the old language, requiring the recording of "the mortgage and *all* assignments," is *more strict* than the current language (applicable to this case), which requires only a *record chain of title.* And, the Michigan Supreme Court in *Arnold v. DMR Financial Services,* 448 Mich. 671, 532 N.W.2d 852 (Mich.1995) construed M.C.L. 600.3204 by relying upon *Feldman, supra,* which considered the predecessor statute. Thus, if the modification to the statute since *Peterson* favors either party, it favors Defendant.

**4.** The substantial-compliance rule was "announced" at least early as 1881, in *Reading,* 8 N.W. at 692.

**5.** This is confirmed by the Michigan Supreme Court's later holdings in *Arnold* and *Feldman* (with *Feldman* construing the foreclosure-by-advertisement statute at issue in *Peterson,* and *Arnold* construing the amended statute).

In *Feldman,* the plaintiff, a mortgagor, complained that an unrecorded assignment (for security purposes) of a mortgage invalidated a foreclosure by advertisement. The defendant, the mortgagee of record, argued that "the holder of an unrecorded assignment has no right to foreclose by advertisement and that the holder of the record title is the only proper party to institute such proceedings." 270 N.W. at 810. The Court adopted the defendant's reasoning and concluded that "[h]aving determined that the defendant company is the only party having the right to foreclose the mortgage by advertisement, and such foreclosure being regular and in accordance with the statute, the conclusion is inev-

are consistent with Michigan precedent generally permitting assignments in blank. *See* (Dkt. 24 at 20 (citing authority)); *see also Kurbel v. O'Hair*, 256 Mich. 680, 240 N.W. 57 (Mich.1932) (recognizing the validity of a deed executed in blank; "if the blank were filled up after delivery, the grantor, if he claimed the benefit of accompanying and related contracts, would thereby make the deed as completed his own, and preclude himself from objecting to the invalidity afterwards.") (quoting *Lockwood v. Bassett*, 49 Mich. 546, 14 N.W. 492, 493 (Mich.1883)).

But the strict rule urged by Plaintiff—that every assignment of a mortgage must occur pursuant to an executed assignment document, naming the assignee at the time of execution, and thereafter recorded—would effectively prohibit all assignments in blank. Indeed, blank assignments are, by definition, not recorded and not recordable.[6] Under Plaintiff's reading, however, even after the blanks are filled in, and the assignment recorded to perfect an interest in the record chain of title, the assignee has not established his right to foreclose by advertisement because there *could have been* an interim holder of the blank assignment that did not record an entry in the chain of title. And, under Plaintiff's purported rule, a mortgagor attempting to avoid foreclosure by advertisement—*a remedy to which he agreed by contract*—could impose great expense and delay in the foreclosure process by alleging that the record-holder of the mortgage must *prove* the non-existence of interim holders of any assignments in blank (something the statute, itself, does not require). As the Michigan Supreme Court acknowledged, however, the foreclosure-by-advertisement statute "was designed to encourage and not to destroy recourse to these simple and cheap remedies." *Reading*, 8 N.W. at 692. It would be "perfectly useless and serve no good purpose" for interim holders of assignments in blank to execute and record separate assignment documents "unless such legal formalism is mandatory." *Peterson*, 6 N.W.2d at 536. I do not find that the law requires such formalism.

itable that plaintiff's bill of complaint must be dismissed." *Id.* at 811.

And *Arnold* addressed the same question under the successor version of the statute. In that case, again, the plaintiff argued that an unrecorded assignment (for security purposes) prevented foreclosure by advertisement because the statute required that *all* assignments be recorded. *Arnold*, 532 N.W.2d at 855. The court rejected the plaintiff's reading of the statute and adopted the *Feldman* reasoning: "we hold again, that [the foreclosure by advertisement statute] provided that only the record holder of the mortgage could foreclose by advertisement, and the mortgagor was not affected by the fact that others had an unrecorded interest in the mortgage." *Id.* at 856.

Similarly here, the Defendant, as record holder of the mortgage, is the only party that may foreclose by advertisement. The Plaintiff is unaffected by any other unrecorded interests (which may or may not have existed) in the mortgage.

6. Plaintiff asserts, without authority, that "Assignments of mortgages in blank ... are prohibited in Michigan as they violate the Michigan recording statute ... in failing to identify the grantee and lack present intent." (Pl. Mot. for Recons. at 8–9 n. 7). Although an assignment of a mortgage in blank cannot be recorded, it does not follow that it is "prohibited" in Michigan. Once the blanks have been completed, as the law permits, the assignment can be properly recorded and will then (and only then) establish notice of the listed assignee's interest in the chain of title. The holder of an assignment in blank thus assumes some risk that an intervening party could record a superior interest in the chain of title during any period that the assignment remains "in blank" and unrecorded. *See Church & Church, Inc.*, 766 N.W.2d at 39 (explaining that Michigan's race-notice statute, which provides that any conveyance of real estate that is not recorded is void as against a subsequent purchaser in good faith, applies to mortgages).

■ The substantial-compliance rule is also consistent with the purpose of the recording laws: "that the true state of the title be represented ... in the public records ... [and further] to protect an innocent purchaser." *See Harr v. Coolbaugh,* 59 N.W.2d 132 (Mich.1953). The foreclosure by advertisement statute requires a "record chain of title ... evidencing the assignment of the mortgage to the party foreclosing the mortgage." M.C.L. 600.3204(3). The same statute also requires that the foreclosing party hold the original note. M.C.L. 600.3204(1). These rules permit *only* the party who holds the note and is record holder of the mortgage, with a record chain of title traceable to the original holder, to foreclose by advertisement. They also ensure that the mortgagor has notice of the party that is claiming that right (i.e., *only* the record holder of the mortgage).

Here, the Plaintiff acknowledges that a *record chain of title* exists evidencing transfers from the original mortgage holder (Lehman Brothers) to the Trust, and from the Trust to the current lender (Defendant). There are no unaccounted for or broken "links" in this chain. And, unlike many of the cases on which Plaintiff relies,[7] the foreclosure by advertisement in this case was not initiated by someone outside the chain of title. Plaintiff, however, is unsatisfied with the *record chain of title;* instead it purports to challenge whether other assignment documents do or should exist, and if so, whether they must be recorded. There is no evidence that other assignments were executed, rather than that the original assignment was executed in blank, transferred in

blank to each subsequent assignee (whomever those entities may be), and ultimately (approximately one month later) that the Trust affixed its name as the assignee and recorded the assignment to place all the world (including Plaintiff) on notice of its claim. Because Defendant has established a *record chain of title* from the original lender to it, it has substantially—if not completely—complied with the statutory requirements. Whether some interim assignee held an assignment in blank or any other unrecorded document does not alter or otherwise cloud the unbroken record chain of title in this case. In these circumstances, Plaintiff cannot credibly argue that it (or anyone else) will suffer "surprise or unfairness" if the foreclosure by advertisement proceeds. *See Reading,* 8 N.W. at 692.

■ Plaintiff also raises several arguments relating to whether the Court was misled about certain transfers of the Loan Documents. Among them, Plaintiff argues that the Court does not have "competent evidence" of the PSA or certain contracts between Lehman Brothers and LBHI. And, according to Plaintiff, the Court was misled as to whether SASC or SASC II was the proper party to the PSA, and whether that party (as depositor to the Trust) ever held the Note or Mortgage. Plaintiff also argues that the Trust was not in existence when the assignment to it was executed. According to Plaintiff, these "irregularities" alter or otherwise cast doubt on the "record chain of title." But the record chain of title is just that—the *record chain of title.*[8] The *record* chain of title demonstrates that Lehman Brothers

---

7. In fact, almost every case upon which Plaintiff relies, including *Ibanez* (discussed extensively below) involves a foreclosure by advertisement initiated (and in some cases, completed) by a party that was not the record holder of the mortgage at the time the foreclosure was initiated.

8. Plaintiff has identified no authority suggesting that a *record chain of title* includes unrecorded documents. By definition, the *record* chain of title is comprised of documents that were filed in the County Register of Deeds' office.

assigned the Mortgage—directly or indirectly—to the Trust; and the Trust assigned the Mortgage—directly or indirectly—to the Defendant. The *record* does not suggest that some other entity claims (or may claim) an interest in the Mortgage.[9] And as discussed extensively in the original Order, the parties to any assignments appear to have ratified or otherwise acquiesced to the transfers and are not challenging them here or attempting to assert any rights in the Loan Documents. Moreover, as discussed below, by virtue of the fact that Defendant is the holder of the Note, it also holds the Mortgage by operation of law. Finally, regardless of what contracts exist between which entities, Plaintiff was not and is not a party to *any* of those contracts (including the assignments), and lacks standing to challenge their validity or the parties' compliance with those contracts here.

Although it is not binding precedent, the Bankruptcy Court for the District of Massachusetts was faced with many similar arguments in *In re Almeida*, 417 B.R. 140 (Bankr.D.Mass.2009), which addressed a

trust's standing to obtain relief from the automatic stay in order to foreclose a mortgage.[10] In that case, the trust established that it was the holder of the original note and mortgage. *Id.* at 142–43. But a third party claimed that the trust nevertheless lacked standing for relief from the stay because the note was not properly negotiated, and "mere possession of a mortgage does not grant the possessor any rights under the mortgage, such as the right to foreclose it." *Id.* at 147–148. The third party also claimed that the assignment of the mortgage was invalid because it failed to comply with certain terms of a Pooling and Servicing Agreement (PSA), which the third party claimed required the mortgage to be assigned to an interim entity (defined as the Depositor in the PSA) before being assigned to the trust. *Id.* at 148. And finally, the third party challenged the timing of some of the assignment transactions. *Id.*

The *Almeida* court first acknowledged the assignee's possession of the note, and the validity of assignments in blank, in general.[11] *Id.* at 148–49. As the holder of

---

By way of example only, Plaintiff claims that Defendant's representation that the "record chain of title consisted of an Assignment from Lehman Brothers, FSB to the LB–UBS Commercial Mortgage Trust 2005-CI, (the "Trust") and then from the Trust to the Defendant" is "untrue." On the contrary, that is *exactly* what the record chain of title consists of—nothing more.

9. In another case cited by Plaintiff, the Michigan Supreme Court explained that "it is the plain intent of [the foreclosure by advertisement] statute that it is a condition precedent to the right to foreclosure by advertisement that the title of an assignee of a mortgage appear of record, and of record in such a manner that evidence extraneous to the record will not be needed to put it beyond reasonable question." *Feldman v. Equitable Trust Co.*, 278 Mich. 619, 625, 270 N.W. 809 (Mich.1937). In this case, without consideration of extrinsic evidence, the *record* identifies Defendant as the current assignee of the Mortgage. It is only by inspecting extrinsic

evidence that Plaintiff can cast "doubt" on the record chain of title by suggesting that there were, in fact, other entities that held an assignment in blank before it was completed and recorded. The statute did not create a system inviting mortgagors to delve into the business dealings of their lenders to determine their compliance with all of their contractual obligations. It offers certain protections to mortgagors, sufficient to ensure they are not at risk of competing claims. And, it offers certain protections to purchasers at a foreclosure sale so that they may purchase a clean title. Those protections are satisfied in this case.

10. The challenges to the trust's standing to obtain relief from stay in *Almeida* were similar to Plaintiff's challenges to the Defendant's standing to foreclose by advertisement.

11. Notably, although both *Almeida* and *Ibanez, infra,* are Massachusetts decisions, *Almeida* suggests that assignments of blank are

the note, the trust had standing to seek payment thereof. *Id.* at 149. The court then explained that, to the extent that the assignment was made without actual authority, that defect was remedied through the assignor's ratification or acquiescence. *Id.* Finally, the court addressed the argument regarding the alleged "invalidity of the Mortgage Assignments because there was no interim assignment of the Mortgage to [the interim depositor entity]:"

> A failure to follow this protocol-such as by direct assignment of the mortgage from the loan originator to the pool trustee, bypassing the depositor-would, the Debtor contends, constitute a breach of the PSA .... The Debtor argues that because the Confirmatory Assignment is a direct assignment from [the original holder] to [the trust] that bypasses the depositor, it must be invalid. This argument falls far short of its goal. *Even if this direct assignment were somehow violative of the PSA,* giving rise to unfavorable tax, regulatory, contractual, and tort consequences, *neither the PSA nor those consequences would render the assignment itself invalid.*

*Id.* at 149 (emphasis added) (quoting *In re Samuels,* 415 B.R. 8, 22–23 (Bankr. D.Mass.2009)). The court also noted that the third party lacked standing to challenge the validity of the assignments:

> [The third-party] is not a third party beneficiary of the PSA, and, ironically, he would appear to lack standing to object to any breaches of the terms of the PSA. It would appear to this Court that the investors who bought securities based upon the pooled mortgages would be the parties with standing to object to any defects in those mortgages resulting from any failure to abide by the express provisions of the PSA.

valid in Massachusetts, while *Ibanez* reaches the opposite conclusion. This distinction is

*Id.* at 149 n. 4 (emphasis added). Ultimately, the court found the direct assignment from the original holder to the trust, bypassing assignment to the depositor, "was sufficient to confer standing" to the trust to seek relief from the automatic stay. *Id.* at 150.

I am persuaded by the court's analysis in *Almeida.* Just as in that case, the Defendant here has established that it is the holder of the original Note and Mortgage. And, just as in *Almeida,* the Plaintiff here lacks standing to assert any breaches in the terms of any contracts between the assigning entities. (Dkt. 24 at 15–18 (discussing Plaintiff's lack of standing to challenge validity of contracts to which it is not a party)). Moreover, any purported breaches in *those* contracts would not render the assignments themselves (which are separate contracts) void. And by transferring the original Loan Documents, including the Note, Mortgage, and all Assignments, all assigning entities appear to have ratified any alleged breaches in the terms of those contracts.

Plaintiff next suggests that because the right to foreclose by advertisement is contractual, "unequivocally, the Defendant must establish that there is a valid contract for each link in the chain of title that ultimately resulted in the Defendant 'owning' the Note and Mortgage." (Pl. Mot. for Recons. at 11; *see also id.* at 8 n. 6 ("Defendant ... must show how the right [to foreclose by advertisement] contractually passed from entity to entity.")). First, I note that this argument is simply Plaintiff's most recent attempt to challenge the validity of the assignments and avoid its obligations under the Mortgage by claiming that the power of sale contained in the Mortgage may not be enforced by Defendant. Plaintiff cleverly argues that it is not attempting to avoid its obligations, but

irrelevant here because Michigan permits assignments in blank.

instead is challenging Defendant's standing to foreclose by advertisement. But, Plaintiff's arguments reach far beyond challenging Defendant's compliance with the statutory mandates, and extend into analyzing whether there are "valid contract[s] for each link in the chain of title" and whether the parties to those contracts complied specifically with their terms. In other words, Plaintiff seeks to challenge whether each and every entity that ever held an interest in Plaintiff's Note and Mortgage complied to the letter with the terms of each and every contract between it and its successor. These are *exactly* the types of challenges that Plaintiff, as a stranger to those contracts, lacks standing to assert. Plaintiff, a mortgagor, contractually agreed to permit its mortgagee to foreclose by advertisement. For all of the reasons articulated in the original Order, and the reasons contained herein, Defendant appears to be the holder of Plaintiff's Mortgage.[12] So long as Defendant complies with its statutory obligations, and it appears to have so complied, it (and only it) may foreclose by advertisement.

 Moreover, Plaintiff has cited no authority purporting to require a entity foreclosing by advertisement to prove the *validity of and conformance with the underlying contracts pursuant to which assignments of the loan documents were executed,* nor have I identified any such authority. By its terms, the foreclosure-by-advertisement statute *does not* require a foreclosing party to conclusively establish a *valid contract for each link* in the title; it requires *only* a record chain of title. As discussed, the statute provides protections allowing a mortgagor to ensure that any party foreclosing by advertisement possesses the original Note, and has (at the time it initiates the foreclosure proceedings) a recorded interest traceable to the original mortgage holder. The Defendant here has satisfied those requirements.

I will close by addressing Plaintiff's reliance on *U.S. Bank Nat'l Assoc. v. Ibanez,* No. 08–Misc–384283, 2009 WL 3297551 (Mass.Land Ct. Oct. 14, 2009). According to Plaintiff, although not binding, *Ibanez* "provides an excellent analysis and guidance of some of the issues in this case." (Pl. Mot. for Recons. at 15). That decision, which has resulted in considerable commentary, currently is on appeal directly to the Massachusetts Supreme Judicial Court, scheduled for argument in September.

In *Ibanez,* as relevant here, the Massachusetts Land Court considered the following question: "did the plaintiff [bank] have 'the right ... to foreclose the subject mortgage in light of the fact that the assignment of the foreclosed mortgage into the [bank] was *not executed or recorded* until *after* the exercise of the power of sale.'" *Ibanez,* 2009 WL 3297551 at *1 (emphasis and omission in original). Specifically, the bank did not obtain or record an assignment of the subject mortgage until fourteen months after the foreclosure sale was concluded.[13] *Id.* at *2 n. 9. At the time of the foreclosure sale, the bank pos-

---

**12.** Those reasons include, but are not limited to, Defendant is the holder of the indebtedness; each predecessor holder of the mortgage transferred the original Loan Documents to Defendant; each predecessor holder appears to have ratified or adopted the transfers, thus curing any breaches in underlying contracts; and Plaintiff may be barred from challenging Defendant's right to enforce the mortgage (and its contractual power to fore-close by advertisement) by laches, estoppel, waiver, and/or ratification.

**13.** Massachusetts law differs from Michigan law in that it "requires that a foreclosing party have a valid assignment of the mortgage at the time of notice and sale, but it does not require the assignment to be 'of record' at that time." *Id.* at *1 n. 7.

sessed the original note and mortgage, each endorsed in blank. *Id.* at *2. As Plaintiff explains, as in this case, those blank-endorsed documents changed hands multiple times before the foreclosing bank obtained them;[14] each transfer occurred without appearing in the public record.[15] *Id.* at *5. The court inspected the underlying contracts providing for the assignment of the loan documents and determined that some terms of those contracts appeared to have been breached by the parties thereto. Specifically, the agreements required that the mortgage assignment to the bank be "in recordable form at the time the loans were transferred." *Id.* at *8. According to Plaintiff, the court found that because only blank assignments were transferred, "in reality, the mortgages themselves were thus still held by the Originator." (Pl. Mot. for Recons. at 16). And, Plaintiff claims, the court found that because the power to foreclose by advertisement is contractual, the violation of the terms of the contract prevented the foreclosure. (*Id.* at 16–17).

But, a closer inspection of the *Ibanez* opinion reveals that the court's holding was based on a very different analysis. Specifically, the court found that "since the blank mortgage assignments failed to name an assignee, they were ineffective to transfer any interest in the mortgage." *Ibanez*, 2009 WL 3297551 at *5. "This is so," it explained, "because Massachusetts follows the 'title theory' of mortgages, making them a type of deed." *Id.* at *5 n. 27. "Under [Massachusetts'] title theory of mortgages, a mortgage of real estate is a conveyance of the title or of some interest therein defeasible upon the payment of money or the performance of some other

condition. Literally, in Massachusetts, the granting of a mortgage vests title in the mortgage to the land placed as security for the underlying debt." *Id.* (quoting *Faneuil Investors Group, L.P. v. Bd. of Selectmen of Dennis*, 75 Mass.App.Ct. 260, 264–65, 913 N.E.2d 908 (2009)). Thus, although the bank held the blank-endorsed documents and could enforce the note as "bearer paper", "since the blank mortgage assignment was ineffective, the mortgage remained with [the originator]." *Id.* at *6. And, accordingly, although the court did find that the terms of the contracts providing for assignments required the assignments to be in recordable form, *it was the fact that blank assignments are ineffective in Massachusetts—not the fact that they breached the terms of the contracts—that invalidated the assignments.* *Id.* at *8 (explaining that the only mortgage assignment executed was "the ineffective blank mortgage assignment", thus the note was held by the bank but the mortgage securing that note was still held by the originator).

The *Ibanez* court also analyzed the question of whether the bank should be deemed the "present holder of the mortgage" by virtue of the fact that it was the present holder of the note and blank mortgage assignments. *Id.* at *10. The court rejected this argument for two reasons: (1) "the blank mortgage assignments they possessed transferred nothing" under Massachusetts law (applying analysis regarding the title-theory of mortgages discussed above); and (2) in Massachusetts, "even a valid transfer of the note does not automatically transfer the mortgage. The holder of the mortgage and the holder of the note may be different persons." *Id.* at

---

14. Plaintiff is quick to point out that several of the entities involved in this case were also involved in the mortgage transfers in *Ibanez*. The similarity of parties is not relevant to the analysis of this case.

15. And, as in this case, the interim transfers occurred by virtue of the transfer of the blank-endorsed documents (i.e. without separate assignment documents being executed for each assignment).

*11 (citation and internal quotation omitted). Notably, even the *Ibanez* court recognized that an assignment to the bank from the last assignee of record would be sufficient—without the necessity to obtain or record assignments for each interim transfer. *Id.* at *11 n. 48.[16]

 I decline to adopt the reasoning of *Ibanez* because the Massachusetts law on which it relies differs from Michigan law in two important aspects.[17] First, unlike Massachusetts, Michigan does not follow the "title theory of mortgages." "Under Michigan law, a mortgage is not an estate in land, it is a lien on real property intended to secure performance or payment of an obligation." *Prime Financial Services v. Vinton,* 279 Mich.App. 245, 761 N.W.2d 694, 703 (Mich.App.2008) (internal citations omitted); *see also Equitable Trust Co. v. Milton Realty Co.,* 263 Mich. 673, 249 N.W. 30, 31 (Mich.1933) ("A real estate mortgage in this state is but a security, in the nature of a specific lien, for the debt.") (internal quotation and citation omitted). Second, unlike in Massachusetts, in Michigan, a mortgage cannot exist separately from the underlying note.

*Prime Financial,* 761 N.W.2d at 703. "A mortgage is a mere security interest incident to an underlying obligation, and the transfer of a note necessarily includes a transfer of the mortgage with it. For the same reason, a transfer of a mortgage without the underlying obligation 'is a mere nullity.' "[18] *Id.* (citing *Ginsberg v. Capitol City Wrecking Co.,* 300 Mich. 712, 2 N.W.2d 892 (1942)); . Thus, *when an assignee takes ownership of a note, the underlying mortgage transfers to it by operation of law. Id.* at 710; *see also id.* at 704 (explaining that, in Michigan, the interests in a mortgage are ascertained by determining whether and to what extent an assignor grants its interest in a note); *Equitable Trust Co.,* 249 N.W. at 31 ("A transfer or assignment of the obligation operates as an assignment of the mortgage.") (citation omitted).

Accordingly, under Michigan law, unlike in *Ibanez,* even if the assignment in blank of the mortgage was ineffective—and I do not believe it was—*because Defendant possesses the Note, the Mortgage incident to that Note transferred to Defendant by operation of law.*[19] And, notwithstanding all

16. Of course, if another assignment was recorded before the bank recorded its assignment, the bank's assignment would again be outside the record chain of title, and the bank would need to obtain an assignment from the *new* assignee of record. *Id.* at *11 n. 48.

17. I also believe the Massachusetts court erred in inspecting the underlying contracts, and any purported breaches in them, where no parties thereto were challenging their validity or effect. But, as explained above, the court's holding did not turn on that analysis so it does not form a basis for my decision here.

18. Plaintiff, in fact, recognized this Michigan doctrine in its original Motion for a Preliminary Injunction (Pl. Mot. for Prelim. Inj. at 10) ("the decisive weight of authority ... holds that an assignment of a mortgage without the underlying debt is a nullity, and therefore unenforceable.... A security interest

cannot exist, much less be transferred, independent from the obligation which it secures. The security interest follows the debt.... If the debt is not transferred, neither is the security interest.") (internal citations omitted). Thus, because Plaintiff plainly understands that, unlike Massachusetts law, Michigan law does not permit a note and mortgage to be held by different parties, I find Plaintiff's reliance on *Ibanez*—and Plaintiff's misrepresentation of the legal basis on which *Ibanez* was decided—to be disingenuous at best.

19. Plaintiff makes a last-ditch effort to save its argument by suggesting that the various contracts assigning the notes and mortgages to subsequent mortgagees may have reserved rights in the original Note holder, or may have lacked consideration, or may not have been valid under the laws of the State governing those contracts. (Pl. Mot. for Recons. at 7). Plaintiff cites the Restatement 3d of Prop-

of Plaintiff's arguments regarding breaches of contracts, incorrectly-named parties, and "irregularities" in assignment documents, just as Defendant is entitled to collect the debt, it is entitled to enforce the other provisions of the Mortgage—including the power of sale.

### III. CONCLUSION

Defendant is the holder of the Note, and the record holder of the Mortgage with a record chain of title traceable back to the original mortgagee. As such, as explained in my prior Order, Plaintiff cannot establish a likelihood of success on its claims. Moreover, Plaintiff has not challenged my previous finding that it cannot establish a likelihood of irreparable harm. Therefore, I now confirm my finding that Plaintiff is not entitled to a preliminary injunction. Plaintiff's Motion for Reconsideration is DENIED.

**IT IS SO ORDERED.**

erty: Mortgages § 5.4 for the proposition that a transfer of a note "also transfers the mortgage *unless the parties to the transfer agree otherwise.*" (*Id.* at 7 n. 4 & Ex. 12 thereto (emphasis added)). But, Plaintiff has cited no binding authority contradicting the Michigan doctrine that a transfer of a note transfers the mortgage by operation of law—without regard to any "agree[ment] otherwise." And, because Defendant is therefore the assignee of the Mortgage, the remaining arguments also fail. Even if this issue was not dispositive as to Defendant's standing to foreclose by advertisement, as discussed, Plaintiff lacks standing to challenge whether the underlying contracts were valid under the law or lacked consideration. Plaintiff cannot circumvent its need for standing by couching its argument as an objection to Defendant's standing; Defendant holds the Note, has satisfied the statutory requirement to establish a *record chain of title,* and is the assignee of the Mortgage.